THORNE *vs.* CRAMER and others.

The act to establish free schools throughout the state, purporting to have been passed on the 26th day of March, 1849, was unconstitutional, and void. The legislature had no authority to refer, to the electors of the state, the question whether that act should become a law; nor had the electors power to determine that question.(*a*)

APPEAL by the defendants from a judgment rendered against them at a special term, after a trial at the circuit before Justice Barculo, without a jury; the parties having waived a jury. The action was brought against the defendants to recover damages for taking and selling and converting to their own use two cows belonging to the plaintiff. The defendants justified the taking as trustees of a school district in Pleasant Valley, Dutchess

(*a*) See the next case, *Bradley* v. *Baxter and others.* The same principle was established by the court of appeals, in *Barto* v. *Himrod and others,* at the July term, 1853.

Thorne v. Cramer.

county, under and by virtue of a warrant duly issued by them, for the collection of a tax levied at an annual meeting in January, 1851, for the support of common schools for the year 1852, in pursuance of the act "establishing free schools throughout the state," passed March 26, 1849. The facts being admitted by the counsel for the respective parties, the judge decided that the evidence was insufficient to constitute a defense, and was inadmissible; and that the plaintiff was entitled to recover the value of the cows, because the act under which the proceedings of the defendants were had was unconstitutional and void. Judgment was given for the plaintiff for $60.

*James Emott*, for the appellants.

*G. Dean*, for the respondent.

*By the Court*, BARCULO, J. The sole point involved in the decision of this case, is, the validity of the act establishing free schools throughout the state, which is found among the laws of 1849, on page 192. The question arises upon the tenth and succeeding sections, which provide that the "electors shall determine by ballot, at the annual election to be held in November next, whether this act shall, or not, *become a law :*" and, after giving detailed directions as to the mode of preparing and depositing the ballots, concludes in the 14th section, by declaring that, "In case a majority of all the votes in the state shall be cast against the new school law, this act shall be null and void; and in case a majority of all the votes in the state shall be cast for the new school law, then this act shall become a law, and shall take effect on the first day of January, eighteen hundred and fifty."

In considering this subject we propose, briefly to examine,

I. The character of the act as it came from the legislature; and wherein it lacked the essential qualities of a valid law:

II. The power of the legislature to delegate or transfer the legislative franchise to the electors:

III. The power of the electors to supply the deficiencies of

the original act, and to infuse vitality into the lifeless form of the statute as it came from the hands of the legislature.

I. As to the first point, we start with the definitions; "Municipal law is a rule of civil conduct, prescribed by the supreme power of a state;" and "Statute law is the express written will of the legislature, rendered authentic by certain prescribed forms and solemnities." (1 *Kent's Com.* 446.)

That the act in question, when it was presented to the public by the legislative body, did not possess the attributes of a law, according to the foregoing definitions, is almost too plain to require argument. It did not command nor prohibit any thing. It imposed no duty, and was not binding upon any person. It did not purport to have any vitality until the next year; and then its life was to depend upon the public breath inspired through the ballot box. Nor did it fulfill the conditions of a *statute law*, as defined by Judge Kent; for, although rendered authentic by "certain prescribed forms and solemnities," it was not the "*written will of the legislature*." That body either had no *will*, or having one, dared not express it; but sent the inert skeleton to another tribunal, to be invested with that living principle which the representatives had not the disposition or the courage to impart. They drew up a bill in due form; they spread it upon the statute book with all due formality, but they nowhere declared it to be the *will* of the law-making power. In the language of an eminent judge of a neighboring state, "as it left the halls of legislation it was imperfect and unfinished; for it lacked the qualities of command and prohibition, absolutely essential to every law." "It operates not *propria vigore*, but, if at all, only by virtue of a mandate expressed subsequently to its enactment, in pursuance of an invitation given by the legislative bodies." All that the legislature can be said to have *willed* is, that the electors should determine whether the bill submitted to them should, or not, become a law. And this brings us to the discussion of the second point, which is:

II. The power of the legislature to delegate or transfer the right of creating laws to the electors.

In examining this branch of the case, it will be necessary to

Thorne *v.* Cramer.

bear in mind, that our state government differs essentially, in this respect, from that government whence we derive the principles of the common law. In England a written constitution is unknown. Their courts are therefore never required to pass upon the constitutionality of laws. The parliament is said to be omnipotent, because its powers are not defined and prescribed. But we are frequently called on to interpose the authority of the court, for the protection of citizens against the encroachments of the legislature. For instances of this, as well as the grounds upon which this power is exercised, we refer to the opinions of this court, in the cases of the *People* v. *The Supervisors of the County of Westchester*, (4 *Barb.* 64;) *People* v. *The City of Brooklyn*, (6 *Id.* 209;) and *Griffing* v. *The City of Brooklyn;* the reasoning and principles of which cases remain, we apprehend, entirely undisturbed. For the purposes of the present case, it is sufficient to say, that this important branch of our jurisdiction, which imposes upon us such great and onerous duties, arising from hasty and improvident legislation, depends upon the existence of our *written* constitution, which assigns to the several departments of the government their peculiar and appropriate powers and duties.

Thus we find that article three, section one of our constitution provides, that " the legislative power of this state *shall* be vested in a senate and assembly;" no other legislative authority is given, except that by section 17 of the same article, the legislature is authorized to confer upon the boards of supervisors, certain powers of local legislation. The law-making power, being thus intrusted to the senate and assembly, by the constitution , it cannot, according to any fair construction of that instrument, be also lodged with, or transferred to, any other body. The members of the senate and assembly are elected by their constituents for the important duty of making laws. No higher trust and confidence can be reposed in man by man. It is to be presumed, that they are chosen for their wisdom, integrity, experience and fitness ; although unfortunately, it sometimes happens, in practice, that they do not quite fulfill all of these requirements. Upon what principle then, can the representa-

tives transfer to any other person or persons, the power of making, or what is tantamount, the power of breathing life and efficacy into laws? Suppose they should attempt to clothe with this authority some individual as the governor, or attorney general would not the common sense of the whole community be shocked at their dereliction of duty? There is moreover, a well established rule of law which forbids such a transfer. A member of the legislature is the voluntary agent of his constituents. He is not compelled to serve them if he chooses to decline. If, however, he accepts the office of legislator, he takes it with all its duties and responsibilities ; and, as a true and faithful agent, he cannot shrink from meeting and discharging them. And, above all, he cannot delegate to others the trust which has been expressly confided to him, by reason of his supposed knowledge and sound judgment. *Delegata potestas, non potest delegati,* is a settled maxim of the common law, in full force at the present day ; and never more applicable than to the case of a legislator. (*Story on Agency,* 15. 2 *Kent's Com.* 633.)

But it is sometimes said that there can be nothing wrong in permitting the representative to restore his power to the people from whom he received it. Such arguments are based upon the idea that he is their creature, and receives his authority solely from them. It is true that he is elected by them ; that he derives his *office* from them ; but it is not true that he derives his *power* from his constituents. His *office* they give him, but his *power* comes wholly from the constitution. He can restore his office to them, by resignation ; but this gives them no authority, except to elect another person in his place. He cannot return to them the power of making laws ; for he did not receive it from them. Again, the same reasoning that would permit a legislator to transfer his power to his constituents, would authorize any other elective officer to do the same. Thus the governor when applied to, to pardon a criminal, might, being unwilling to take the responsibility of deciding upon the application himself, call an election and submit it to the people. The courts, whenever a case of peculiar difficulty came before

them, might call together their constituents to ascertain how the popular feeling stood. The present case is peculiarly adapted to this illustration. It involves the validity of a law which concerns every person in the community. Our decision must affect, in some degree, every one of our constituents. Why should not we then be allowed to submit it to the electors, to say by ballot, how this case should be decided, with as much propriety, as the legislature originally submitted it to them, to determine whether it should become a law? If they can be permitted to *create* a law at an election, by the same will, they can *adjudge* it to be a *valid law.* Every person must perceive how preposterous such a proceeding would be! And how deservedly contemptible every officer and court who should resort to such means of evading the just responsibilities of his office, would be held.

The doctrine that no harm can result from allowing the people to exercise, directly, the law-making power, is more plausible than sound. If it were a legitimate subject for investigation at this time, we think it might be easily shown, that some of the very worst evils must necessarily flow from such a violation of the fundamental law. The constitution has wisely deposited the legislative power in the hands of a limited number of chosen men. This is done, partly, because of the impracticability of having laws passed in a mass assemblage of the people; and, partly, because it is supposed that the chosen representatives will be better qualified for the duty than a considerable portion of the electors. It is hardly necessary to say, that many voters are not in all respects qualified to become governors or legislators. They may have discretion enough to select suitable men for those offices; but if they were put directly to the business of framing laws themselves, they would be quite out of their element. Can we not then foresee dangers to arise from a delegation of the legislative franchise, even to the people themselves? In the language adopted by the supreme court of Pennsylvania, " If the two houses can divest themselves of their office of lawmakers, and devolve it upon the body of the people, what security have we against the passage of laws, perhaps well meant,

but liable to be glaringly wrong, because inconsiderately adopt-ed? And what check is left upon hasty and ill-advised zeal, open to be influenced and misguided by interested, cunning, or blind fanaticism? If the practice be sanctioned, there may follow a train of experiments which, unarrested at some point of their progress, must end in the final overthrow of the constitution. Every case of doubtful propriety will be referred to the result of a ballot; and acts of the assembly, subject to the popular vote, will be yielded to unthinking clamor or partisan importunity, by faithless legislators anxious to escape the responsibility of their position."

III. We now come to the consideration of the remaining question—whether the electors have any right or power to supply the deficiency of legislative action, and bring into life a law which before was *not a law.*

Assuming now, for the purposes of the argument, that there was no impropriety in the legislature calling in other aid, we suppose it to be perfectly clear, that the electors had no power to act in the matter; and that, even if every voter in the state had given his vote for this law, and was still in its favor, it would, nevertheless, be the plain and sworn duty of every court, before whom the question was brought, to pronounce the act unconstitutional and void. This results, necessarily and inevitably, from the nature and provisions of the constitution itself. According to the theory of constitutional governments all power is inherent in the people. They are the original sovereigns. Before the establishment of a regular government they exercise the power in their native capacities. They themselves not only make, but administer the laws. They enact; they adjudge; they execute. For, in that state of nature, *might* makes *right;* and majorities are, of course, omnipotent and despotic. But, when the people frame a constitution to live under, they yield up certain natural, personal rights, and consent that those yielded rights shall, thenceforth, be exercised only by certain selected persons, in a prescribed manner. Thus, at the adoption of our constitution in 1846, the people of this state parted with their original right of making laws, and vested that right in a senate

Thorne v. Cramer.

and assembly. The right to administer the laws was, at the same time, vested in the courts. The people did not reserve to themselves any authority, directly, to make or administer laws. Now so long as that constitution stands, these their natural rights are, as to them, suspended; and are vested in the representatives designated by that instrument. The people can resume those rights only by a destruction of the constitution; or, in other words, by a revolution. Hence the citizens of this country cannot assemble and decide upon the guilt of the prisoners in jail, and award their punishments; because they have agreed by the fundamental compact that such matters shall be determined by the judicial tribunals. Nor, if they should attempt it, could any unanimity, nor device, nor even legislative aid, legalize their proceedings. In like manner they have no right nor authority to meet at the ballot box and determine upon the *existence* of laws; for they have expressly agreed, in the most solemn manner, that, that prerogative *shall* be exercised by the senate and assembly.

But it may be asked, are not majorities to govern? We answer, they are to govern ONLY IN THE PRESCRIBED FORM. If the majority wish the passage of a certain law, they must elect such representatives as will make the law, in the mode pointed out by the constitution. The minority have consented to be governed by such statutes as are passed in the constitutional manner; but they have never consented to submit to such laws as the majority should enact at the polls: and the constitution is designed for the protection of minorities against the caprices, recklessness, or prejudices of majorities.

It is always an unpleasant duty to come into collision with the legislature, by being required to adjudge their proceedings to be void. It is emphatically so in the present case, by reason of the great importance of the question involved; touching, as it does, upon the subject of universal education, and the due administration of the legislative franchise. But we are not permitted to let our opinions be swayed or influenced by such considerations. The interest of the whole community requires that the fundamental compact should be preserved sacred and

inviolate; and although we are fearful that it may have already received some dangerous wounds from those who should have watched over and cherished it, we have the consolation of knowing that the blows have not been inflicted from this bench. If others, overwhelmed by the magnitude of the subject, have at times, from a want of firmness to meet it fairly, faltered in their duty, we must not, therefore, shrink from performing ours.

Nor can we yield to arguments drawn from expediency, or from the supposed disastrous consequences which are to flow from our decision. Nor are we to be influenced by the consideration that similar infractions of the constitution have heretofore obtained. That courts may at times have listened too much to the voice of expediency, and shaped their decisions with reference to predicted consequences, is possible; and that similar violations of the constitution may have crept in, and lay concealed or unnoticed, is possible; for it corresponds with the insidious character of such encroachments: but one thing is certain—that in deciding questions of this kind, a court of law is no place for the doctrine of EXPEDIENCY. We fully concur in the remarks of Judge Bronson on this point. He says: "Believing, as I do, that the success of free institutions depends on a rigid adherence to the fundamental law, I have never yielded to considerations of expediency in expounding it. There is always some plausible reason for the latitudinarian constructions which are resorted to for the purpose of acquiring power; some evil to be averted, or some good to be attained by pushing the powers of the government beyond their legitimate boundary. It is by yielding to such influences that constitutions are gradually undermined, and finally overthrown. My rule has ever been to follow the fundamental law as it is written, regardless of consequences. If the law does not work well, the people can amend it; and inconveniences can be borne long enough to await that process. But if the legislature or the courts undertake to cure defects, by forced or unnatural constructions, they inflict a wound upon the constitution which nothing can heal. One step taken by the legislature or the judiciary in enlarging the powers of government opens the door for another, which will be sure to follow; and so

the process goes on, until all respect for the fundamental law is lost, and the powers of the government are just what those in authority please to call them." (3 *Comst.* 568.)

In the case of *Parker* v. *The Commonwealth*, (6 *Barr*, 507,) this whole subject is examined at length, and with great ability, by the supreme court of Pennsylvania, in a case involving the validity of an excise law submitted to the people. Upon the subject of previous legislation they say, " a bad precedent, suffered to pass *sub silentio*, cannot be set up to justify the continuance of an abuse in which it originated ; and this is especially true where the question is of the constitutional exertion of a delegated power : a different rule would expose the fundamental laws of the state to continual danger of subversion from a succession of encroachments which in the beginning did not attract the public attention or invite its investigation—a consequence too momentous to be hazarded by unreasonable deference to tolerated mistakes." " The duty of preserving the constitution intact is paramount to every other, and, irrespective of veteran abuses, so imperatively calls for the eradication of the canker, that the judiciary, which should shrink from applying the appropriate correction, would be justly chargeable with a gross dereliction of duty."

To this we will only add, that nothing can be really so *inexpedient* or pernicious in its consequences, as the toleration of a continued violation of the constitution, in so vital a matter as the exercise of the law-making power.

Our conclusion is that the act purporting to be an act for the establishment of free schools throughout the state, and to have been passed on the 26th day of March, 1849, was not at any time a law, but was wholly inoperative and void.

The judgment of the special term is therefore affirmed.

[KINGS GENERAL TERM, October 6, 1851. *Morse, Barculo* and *Brown*, Justices.]