By the Court, Wright, J.
Prior to 1798, the corporation of the city of Albany conveyed to sundry persons the franchise of dockage and wharfage in the harbor and port of that city, opposite to and adjoining what were known and called the middle or inner docks. In the conveyances of the franchise the corporation reserved the right of regulating by ordinance the price to be paid for wharfage. In December, 1820, an ordinance was adopted, fixing the rates of wharfage for vessels of five tons burthen or under, by the season, $1.06 per ton; and over five tons burthen, twenty-seven cents per ton ; by the day, vessels of five tons burthen or under, ten cents per ton per day' of twenty tons or under, and over five tons, two cents per ton per day'; between twenty and forty tons, one and a half cents per ton per day, and for vessels above forty tons burthen, at tho rate of one and a quarter cents per ton per day. This ordinance was in force in April, 1823, and up to that time dockage and wharfage were charged and collected under it.
On the 5th of April, 1823, the legislature passed An act authorizing the construction of a basin in the city of Albany, at the termination of the Erie and Champlain canals.” This act was passed by a majority vote in both branches of the legislature. It provided for the appointment of a board of commissioners to raise, by subscription, a sum of money to be expended in the construction of a mole or pier in the Hudson river, within the bounds of the city of Albany, and opposite the docks fronting the harbor, so as to comprise a basin, extending from the state arsenal dpck to a point opposite Hodge’s dock, on the line of Hamilton street. The commissioners were authorized to circulate the subscription among the citizens of Albany and others disposed to subscribe to the fund ; to adopt *40 all such measures as they might deem necessary and proper for the attainment of the object contemplated; to appoint from their number three acting commissioners, one of whom they were to designate as superintendent of the work, whose duty it should be to collect and receive the moneys subscribed, and to pay the same out to those furnishing materials or performing services for the work. The acting commissioners were to proceed and execute the work, and as soon as it was finished the commissioners of the land office were required to grant, by letters patent to the board of commissioners, or to the survivor dr survivors of them as joint tenants, the land under the water of the Hudson river, occupied by the mole or pier, but no wharfage or other charge should ever be exacted from canal boats or other craft, or rafts of lumber entering from the canal and using the waters of the basin, or passing through the same into or from the Hudson river, or for lying along side the pier or bridges, unless the same should be revested in the people of the state. The act further provided, that for all vessels, boats, or other craft, navigating the Hudson river (excepting canal boats) and entering into the basin, there should be paid by the owners or masters of such vessels, &c., for wharfage, a sum equal to double the rates, established by the ordinance of the corporation of December, 1820; the wharf-age to be collected by a wharfinger or dock master, who, after deducting compensation for his services, should pay over one half of the residue to the proprietors of the pier, in proportion to the extent of their respective rights and interests therein. The proprietors of the pier were also authorized to charge for all vessels lying in the Hudson river, at and on the east side of the pier, except for vessels paying wharfage for the season in the basin, the like rates of wharfage as were then payable to the owners of the middle docks. As soon as the commissioners of the land office had granted the land under water, the act made it the duty of the commissioners to divide the pier into lots or parcels not exceeding forty feet in width, and sell the same at public auction ; the moneys arising from such sale to be divided among the several subscribers to the fund, or their legal representatives, in the same proportions which their sever *41 al subscriptions should bear to the entire amount of moneys subscribed and paid in. The grant of the land under water, on which the pier, when erected, was to stand, was to be void if the legislature should, within five years from the first of May, 1823, make provision by law for the re-payment to the commissioners of the amount expended by them in erecting it. The last section of the act provided “ that the corporation of the city of Albany shall file their consent to this bill, within sixty days after the passing of the same, with the secretary of state, otherwise this bill shall be void, and the state shall not be liable to the company or to the city of Albany for any thing done by virtue of this act.” (Laws of 1823, ch. 111.)
The corporation of Albany, on the day the act passed, filed their assent to it. The commissioners constructed the pier and divided the same into lots, and in July, 1825, sold the lots at public auction and conveyed them to the respective purchasers. The conveyances, to which the corporation of Albany was a party with the commissioners, among other things provided that the owners of the pier should meet annually and elect a president, secretary and superintendent of the pier ; the superintendent to receive all canal tolls payable to the use of the pier owners, and all dockage and wharfage provided by the act, and after making, with the money that should come to his hands for wharfage, <kc., repairs needful to keep the pier, streets and bridges at all timos in good order, and paying the salaries of himself and his assistants, divide the residue of the funds in his hands annually among the several owners of the pier lots in just proportions. The rates of wharfage and dockage charged and collected by the dock master at Albany, arid divided between the pier owners and the middle dock owners, since the passage of the act of 1823, and until the year 1850, were according to the rates established by that act.
In April, 1850, the legislature passed an act providing, that for all vessels, &e. navigating the Hudson river, (except canal boats and other craft using and navigating the canal,) which shall come to and lie at the pier or mole on the east side of the city of Albany, and on the east side of the pier or mole ; and *42 .for all vessels, Spc. (except canal boats,) which shall make fast to the pier on either side thereof, there shall be paid by the owners or masters of such vessels, &c. certain specified sums for wharfage, being half the amount of the rates fixed by the act of 1823, and to be payable to and collected by the proprietors of the lots on the pier, or to the dock master or agent that they shall appoint for that purpose. The act also provided that no other charge"for wharfage should thereafter be exacted by or for the benefit of the proprietors of the pier, on or for any boat, vessel, flat or other craft entering the basin formed by the mole or pier, than such as was expressly allowed by that act; and all laws or parts of laws conflicting with its provisions were thereby repealed. (Laws of 1850, ch. 158.)
In 1850 and 1851, the defendants were the lessees of the middle or inner docks, and occupied them. They were the owners of certain vessels navigating the Hudson river, and at various times, in these years, these vessels entered the Albany basin from the Hudson river, in order to reach the middle or inner docks, for the purpose of receiving and discharging their cargoes, and did discharge and receive their cargoes at such docks; but at no time did the vessels come to, lie at, or make fast to the pier. The amount of wharfage chargeable, pursuant to the act of 1823, upon the vessels of the defendants, for the seasons of 1850 and 1851, was $1390.83. At the commencement of this suit in 1852, the proprietors of the Albany pier consisted of more than seven persons in number, and the plaintiff was their president. The proprietors, in the name of their president, brought the action to recover wharfage claimed by them under the provisions of the act of April, 1823, accruing in the years 1850 and 1851.
To sustain a recovery, three things must concur: 1st. That the act of 1823 was constitutionally passed; 2d. That that of 1850 is unconstitutional; and 3d. That the action is rightly brought in the name of the president of the pier proprietors. The first two questions relate to the merits; the last to the proper party to maintain the action.
In Buckbee v. Brown, (21 Wend. 110,) it was held that the *43 right to sue for wharfage was exclusively in the corporation of-Albany. The dock master authorized by the act of 1828 to collect the wharfage brought an action against the owner of a vessel entering the basin and lying at the docks of the city; but this court held that the exclusive legal interest in the wharfage being in the corporation of Albany, the remedy for its collection could be only in the name of the corporation. So also in the case of The Mayor &c. of Albany v. Trowbridge, (5 Hill, 71,) the point was raised by the defendants that the action could not be sustained by the corporation, inasmuch as they had no interest in the suit or in the moneys sought to be recovered; but the court held that the legal interest in the wharfage conferred upon the city by their charter was not divested by the act of 1823, and suits for the collection thereof must therefore be brought in the corporate name of the city. Thus, prior to the adoption of the code of procedure, it was settled that the right to sue was exclusively in the corporation. It is supposed, however, that the code has conferred upon the pier owners the right to maintain the action, and that by special statutes, passed in 1849 and 1851, in relation to joint stock and other companies, and associations of seven or more persons in number, it may be brought in the name of the president of such association. The statute of 1849 provided, that any joint stock company or association, consisting of seven or more shareholders, or associates, might sue or be sued in the name of the president or treasurer for the time being; (Laws of 1849, ch. 258 ;) and the statute of 1851 extended the provision to any company or association, composed of not less than seven persons, who are owners, or who have an interest in any property, right of action or demand jointly or in common, or who may be liable to any action, on account of such ownership or interest. (Laws of 1851, ch. 455.) These statutes conferred upon the plaintiff no right to sue, except in cases where the shareholders or associates could before have prosecuted. Their intent was to obviate the inconvenience of joining all the shareholders or associates as parties; to facilitate an existing right of action, and not to create a new one. The plaintiff, by virtue of those statutes, can only bring such actions as *44 the pier owners could have maintained before; and prior to their adoption, and under the act of 1823, the pier owners could not sue persons entering the basin, for wharfage. The plaintiff’s counsel conceded on the argument, that if, after the passage of the code, the action could not be sustained by the pier owners, it cannot be sustained in the name of their president.
The code changed the rule in relation to parties to actions; adopting, with slight modification, that which formerly obtained in courts of equity. It provided that every action must be prosecuted in the name of the real party in interest; except that an executor or administrator, a trustee of an express trust, or a person expressly authorized by statute, may sue, without joining with him the person for whose benefit the action is prosecuted. (Code, §§ 111, 113.) The real party in interest is the person for whose benefit the action is prosecuted, and who is to reap the fruits of the litigation. The right of the corporation of Albany to sue for wharfage resulted from the common law doctrine of its being the technical owner. It has no real interest in the moneys to be collected for wharfage, as after the passage of the act of 1823, one half belongs to the pier owners and the other half to the middle dock owners. All the interest it may be said to have is as trustee, clothed with the duty of collecting and paying over the wharfage to the pier and dock owners, after deducting the compensation of a dock master. The act of 1823 directs the dock master, after collecting the wharfage from persons entering the basin, and deducting therefrom a compensation for his services, to pay over one half of the residue to the proprietors of the pier in proportion to the extent of their respective rights and interests therein. The pier owners are, therefore, the persons really interested in one half of the wharfage, after deducting the compensation of the wharfinger, and are to that extent the persons for whose benefit the action is to be prosecuted ; and being so, it is contended that they may, under the provisions of the code, making it obligatory that the party to the record shall be the real party in interest, maintain the action. But are the pier owners, “the real parties in interest” within the meaning of the statute, capable of prosecuting this *45 action in the form in which it has been brought ? The code provides that a trustee of an express trust, or a person expressly authorized by statute, may sue without joining with him the person for whose benefit the action is prosecuted. This provision is permissive in its character, and its effect is not to exclusively limit the right to sue to the trustee or the person authorized by statute. A cestui que trust, being the real party in interest, may bring an action in his own name, but for convenience he is allowed t'o bring it in the name of his trustee. This he may waive. The corporation of Albany is not by the express terms of any statute authorized to sue, (the authority being only implied from the duty of collecting which the statute enjoins,) and hence if the code in such case limited the right to sue to the person authorized by statute, the provision could not affect this case. The corporation, however, under the act of 1823, may be regarded as the trustee of an express trust. They are to collect the wharfage, and distribute it among the pier and dock owners ; but though they may maintain an action, without joining with them the cestuis que trust, the provision is not a positive prohibition against the latter, under any circumstances, bringing the suit themselves. The 113th section of the code is not, therefore, in the way of the pier owners being the proper parties to sue, provided they are the “ real parties in interest” contemplated by the 111th section, and sue in the right form.
The action is brought by the pier owners as an association, or by the plaintiff in their behalf, for their portion of the wharfage. Prior to the act of 1823, the dock owners were entitled to the wharfage collected by the corporation. The act of 1823 doubled the rates then payable to the dock owners, and practically separated the rights of the pier proprietors from those of the dock owners. It imposed an obligation on those entering the basin, to pay the prescribed rates of wharfage; and the agent of the corporation was required to pay over one half of the money collected to the pier proprietors, without regard to the claim of the owners of the middle docks. To hold that the pier owners may maintain the action for their part of the wharfage would not lead to the absurd and mis *46 chievous consequences apprehended, of-severing. the obligation to pay, contracted, by those entering the basin, and subject them to suits by each dock owner for his share of the wharfage. But, for aught that I can perceive, it would practically repeal by implication so much of the act of 1823 as directs the agent of the corporation to collect and distribute the wharfage; and would subject those entering the basin to a second action or distress by the corporation, notwithstanding any recovery by the pier proprietors. It may possibly be that a recovery by the pier owners would be a good answer to an action on the part of the corporation, and that a court of equity would restrain the collection by distress of the pier owners’ share of the wharfage, for which they had already recovered. These, however, are but some of the consequences growing out of permitting a cestui que trust, instead of the trustee, to enforce the trust. It is said, also, that it would impose on all entering the basin the necessity of ascertaining who the distributees were, and the amount due each, or of refusing payment at their peril. But there is no difficulty of this kind. Those entering the basin may voluntarily pay to the dock master, and that discharges their liability.
There can be no doubt of the right of the corporation to sue for wharfage, even since the code. They are the trustees of an express trust, and as such may maintain the action without joining with them the cestuis que trust. The pier proprietors, if as an association they were really and exclusively interested in the claim sought, to be recovered, we think, since the code, might also sustain the action. It would be safer, perhaps, in the latter case, to unite with the corporation, but it is not absolutely required. Still there seems to me a fatal objection to sustaining this action in the present form. The act of 1823 imposes on the corporation the duty of collecting the whole wharfage from those entering the basin, a moiety of which is to be paid to the pier proprietors, but not as a company or association. The entire moiety is not to be paid by the corporation to an association, leaving to the association the further duty of distributing it amongst its members. The corporation itself, through its agent, the dock master, is to distribute the fund) *47 not in gross to an association of persons, but singly to each proprietor, to the extent of his right or interest therein; so that the interest in, and ownership of, the fund, when distributed, is not joint, but several, each pier owner being a distributee, and receiving and holding his share not in common but sepaately. There are as many separate interests in the fund as there are pier owners or distributees.
This action is brought in the name of the president of an association, to recover an entire moiety of the wharfage, though the association is not, jointly or in common, either entitled to, or interested in, the right of action or demand. It is only in cases where the association, as such, is the owner, or has an interest, joint or in common, in any property, right of action or demand, that a suit may be maintained in the name of the president of the association. The statutes of 1849 and 1851 thus limit the right. The separate owners of demands, or of separate rights of action, cannot voluntarily associate and elect a president, and, under the statutes of 1849 and 1851, recover in the name of such president, in one suit, the separate demands. As well might the proprietors of lots upon the pier maintain an action in the name of their president, to recover any other separate demand as that of wharfage, which, when distributed, is not the joint or common property of an association, but received and held separately by each proprietor. Hor have the pier owners themselves agreed, if they could do so, to throw their .respective interests, upon the receipt of the wharfage, into common stock; for in the deeds of conveyance of the pier lots, which seem to be the only articles of association, whilst there is a provision for the election of a superintendent to receive all canal tolls payable to the use of the pier owners, and all dockage and wharfage provided by the act of 1828, he is to divide the residue of the moneys that may come into his hands for dockage and wharfage, (after deducting cost of repairs and compensation for his services,) among the several owners of pier lots, in just proportions.
This objection, however, has relation only to the parties who may rightfully prosecute the claim, and the form in which the *48 action is brought, and not to the merits. As the objections may, hereafter, be obviated, by commencing actions in the names of the parties entitled to sue, it is proper that the merits should be examined, with the view of determining whether the claim can be enforced against the defendants, under any circumstances.
If the pier proprietors can recover at all, it is by virtue of the provisions of the act of 1823. Any right they may have is exclusively derived from the legislature, and under that enactment. That act assumed to fix unalterably the rates of wharfage in a part of the harbor of Albany, and bestow half of it on the persons who should subsequently become the owners of pier lots. If it were a constitutional exercise of legislative power, and the act has not been, so far as it affected the right to claim wharf-age from the owners of the middle docks, repealed, then the defendants, though lessees of the middle docks, would be amenable on entering the basin, with a view of reaching their own docks to receive and discharge cargoes, so that if the question of the constitutionality of an act of the legislature be always a grave one, it is of especial importance to the defendants in this case, as the legislature assumed to authorize the construction of a pier in front of their docks, thus forming a basin between the docks and the pier, and arbitrarily imposed on them a toll or charge for entering such basin to reach their own docks.
The 12th and last section of the act of 1823, as we have seen, provided that the corporation of the city of Albany should file their consent to the bill, with the secretary of state, within sixty days after the passing of the same, otherwise the bill should be void. The act, therefore, it is urged, was passed on condition that it should not be a law unless the corporation consented, which was not a constitutional exercise of legislative power. The constitution of 1821 vested the whole legislative power in the senate and assembly, subject to the qualified veto of the governor. (Const. art. 1, §§ 1, 12.) A statute that is not an expression of the legislative will alone, has no binding force as a law. It can only become a law, mandatory and obligatory upon those who are the subjects of it, by a declaration of the legislative will. An attempt, therefore, to call in another party to aid in *49 the business, and divide the responsibilities, of legislation, so that the act shall not be the single expression of the legislative will, but the sovereign function is discharged in part, at least, by a party unknown and unrecognized by the fundamental law, would be in contravention of the constitution and fender the act void. But this should be patent and manifest on the act itself. How, was not the act of 1823 an expression of the legislative will alone? We think it was. The sovereign function of legislation was discharged by the senate and assembly, unaided by the corporation of Albany. They passed the act without submitting the question to the corporation, and it was not within the scope or object of the legislature to shirk exclusive responsibility. They did not assume to delegate to the corporation the power to enact the law, nor call the corporation in to aid in its passage, or in any way to divide the responsibility of that act. It is true, the 12th section provides that the bill shall be void, unless the corporation of Albany file their assent to it within sixty days after its passage. But this was the unaided act of the legislature, and as much an expression of the legislative will alone, as any other provision of the bill. That the legislature may constitutionally pass a law, and provide that it shall take effect at some future period or upon the happening of some future event, we cannot doubt. Indeed, we entertain no doubt of their constitutional power to declare that an act passed by them shall cease to exist as a law, unless, within a specified period, an act specified in it to be done shall be performed by the person or body to be affected by it. The ease of Parker v. Commonwealth, (6 Barr, 507,) is not opposed to this view, even if the ground of that decision be not subsequently overruled by the same court in the Commonwealth v. Quarter Sessions, (8 Barr, 391,) and the Commonwealth v. Parker, (3 id. 214.) In the Commonwealth v. Quarter Sessions, the same judge who delivered the luminous and admirably philosophical opinion of the court in Parker v. Commonwealth, took occasion to say that the only principle settled in the latter case was, that the general assembly of the commonwealth could not delegate to the people a power to enact laws by the exercise of the ballot; and *50 it was held distinctly that the legislature might repeal a law through the secondary means of a popular vote. Nor are the cases of Thorne v. Cramer, (15 Barb. 112;) of Bradley v. Baxter, (Id. 122,) and of Barto v. Himrod, (4 Selden, 483.) in hostility to the principle that the legislature having, unaided, passed a statute, assumed the exclusive responsibility of bringing it into existence as a law, and expressed the legislative will alone, may annex to it a provision that the law shall cease to exist unless a party, in some degree to be affected by it, shall, within a limited period prescribed by the legislature itself, perform an act, also prescribed in the statute. Those were all cases arising under the free school act of 1849. A bill having in view the establishment of free schools throughout the state, had passed through the forms of legislation. In the hill itself there was a provision that the electors of the state, at the annual election to be held in November following, should determine by ballot, whether the act should or should not become a law, and it further provided for submitting the question to the people through the ballot box, and in case a majority of all the votes in the state should be cast against the new school law, the act should be null and void, and in case a majority of all the votes should be cast for the new school law, then the act should become a law and should take effect, &c. All that was done in the supreme court in the cases of Thorne v. Cramer and Bradley v. Baxter, was to apply to this school act, and we think correctly, the principles that the legislature could not delegate to the people the power to enact laws by the exercise of the ballot, and that an act is without efficacy as a law, which is not an expression of the legislative will alone. The legislature had attempted to throw off all responsibility and avoid the exercise of all law-making power, casting the power upon the people, which they had voluntarily surrendered and exclusively vested in a senate and assembly, by the adoption of the constitution. All that the legislature did, was to draft and perfect the details of a bill. The question whether it should become a law or even find a place upon the statute book, was wholly submitted to the electors of the state. If enacted, it was the act of the people *51 through the exercise of the ballot, and an expression of the popular, and not the legislative will. The power of legislation was virtually yielded back to the people to be exercised in a form and in a mode in contravention of the fundamental law: the legislature not advancing a step towards a declaration of its will, nor intending to do so. In Barto v. Himrod, a case in the court of appeals, the decision did not necessarily turn upon the constitutionality of the school act. The act had not prescribed the evidence by which it was to be known whether it took effect or not. The result of the popular vote was neither admitted by the pleadings nor established by the evidence. There was a total defect in the proof that the act had been adopted by a vote of the people. “We should, therefore,” says the learned chief judge, “be compelled to affirm the judgment of the supreme court for the want of this proof, whether the law is valid or not.” But he’ proceeds to discuss the question whether, what was called a statute was ever “ enacted in form or spirit according to the constitution,” and arrives at a similar conclusion, and upon similar grounds with the supreme court, that it never took effect as a law, although it may have had the vote of the people in its favor. The proposition is conceded by the judge, that a valid statute may be passed to take effect upon the happening of some future event, certain or uncertain, if, when it comes from the hands of the legislature, it be a law in presentí ; in other words, if it be the act of the legislature and the embodiment and expression of its will alone, and it has definitely and finally exercised its judgment on the subject matter of legislation. If the law emanates from the legislative will alone, and has an existence from that single source, it becomes a mere question of expediency when and how it shall cease to exist, upon which question the legislature may properly exercise its judgment, and having exercised and given expression to it in the statute, the statute is not for that reason invalid. Ho third party, unrecognized by the constitution, is called in to enact the law and give it vitality. Ho action is required, other than that of the legislature, to give it being as a law. We think that the expression of the legislative will, in the last section of the act of 1823, that the law *52 should cease to exist, unless the corporation of Albany filed their assent to it within a specified period, did not render the act invalid. As the act contained various provisions affecting commerce and other interests of the state, it may have been unwise legislation to provide that the law should cease to exist, unless a party affected by it performed an act evincing consent to its provisions, but it was not an unconstitutional exercise of legislative power.
The act of 1823 was passed by a majority vote. The constitution of 1821 provided that the assent of two-thirds of the members elected to each branch of the legislature should be requisite to every bill appropriating the public moneys, or property, for local or private purposes, or creating, continuing, altering or renewing any body politic or corporate. [Const. Art. 7, § 9.) There is nothing in the act purporting to appropriate public property for local or private purposes, unless it be the provision in the 5th section, authorizing and requiring the commissioners of the land office, in a certain contingency, to grant to the commissioners for the construction of the pier, the land under ■the water of the Hudson river, occupied by the pier and sloop lock. This grant was to be made upon the pier and sloop lock being finished, forming a basin which by a subsequent section was practically made a part of the cabal; and this basin, so far as it concerned boats and other craft using and navigating the canal, was to be exclusively controlled by the state officers, the latter charging and recovering tolls on canal boats entering it, in the same manner as if it were a part of the canal; and no tolls were to be exacted, or any charge for wharfage made on canal boats or other craft, entering from the canal and using the waters of the basin, or passing through the same into or from the Hudson river, or for lying alongside the pier, unless the same should be revested in the people of the state. The land under water was within the boundaries of the city of Albany, hut may be regarded as held by the state by the right of eminent domain. In this view, and no other, it was public or state property. The commercial and other interests of the state were to be promoted by the construction of a pier in the Hudson *53 river, and the state was not then disposed to do the work. It was willing, however, to aid the construction by private enterprise, and make a conditional grant of the land under water on which the pier and sloop lock should be erected. We do not think that this was appropriating public property for local or private purposes, within the sense and meaning of the constitution.
But it is urged that the- act was passed in violation of the constitutional provision requiring the assent of two-thirds of the members elected to each branch of the legislature to a bill altering a body politic or corporate ; and that by the act in question, the powers previously possessed by the corporation of the city of Albany were essentially altered.
The mayor, aldermen and commonalty of the city of Albany are a public corporation. Public as well as private corporations are Avithin the constitutional provision. This question has been the subject of considerable discussion, but is now definitely settled. (Purdy v. The People, 4 Hill, 384. Stanton v. Stanton, MS. opinion of Mr. Justice Beardsley, in supreme court.) The only question, therefore, on this branch of the case is, Avas the corporation of Albany altered by the provisions of the act? Any act which affects the poAvers of a municipal corporation by enlarging or abridging them, or applying them toneAV subjects, or authorizing their exercise on neAv occasions, or in neAV modes and forms, alters the corporation, and is Avithin the constitutional restriction. A body politic or corporate can be altered in no other ay ay than by adding to or taking from its poAvers. (2 Hill, 42, per Bronson, J. Purdy v. People, 4 Hill, 384. Stanton v. Stanton, Sup. Ct. opinion by Beardsley, J., afterioards affirmed on error, MS. Green v. Biddle, 8 Wheat. 2, 84, 85.) But as general propositions these ay ere admitted in the argument at bar. Their application to the case in hand Avas the contested question.
That the legislature acted upon the supposition that the act in some way affected the poAvers of the corporation of Albany, is apparent from the concluding section,- declaring that it should cease to exist as a laAV, unless the municipal government filed *54 its consent within sixty days after its passage; and that failing to do so, the state should not be liable to the city for any thing done by virtue of the act. The idea that the act in its whole scope and nature is merely a compact between the state and a subordinate party, (the common council of the city, of Alban-y,) and that it does not profess to have the character of law in respect to those features affecting the corporation in its legislative and executive character, is more fanciful than sound. It either altered the corporation or it did not; and the objection that it falls within the constitutional restriction, can as well be taken by the defendants as by the corporation itself.
Prior to the act of 1823, the corporation, by its charter, was authorized to regulate the manner of constructing wharves and slips within the bounds of the city; it had also the right to charge, collect and receive wharfage from all boats and water craft lying at the wharves or anchored in the port opposite thereto. The common council possessed the power to regulate by ordinance the rates of wharfage, and the manner in which it should be collected; to establish and regulate docks and wharves, or whatever might be necessary, in and about the same ; and their jurisdiction extended on the east to the line of Rensselaer county. (2 R. S. 469. Hunt v. Mayor &c. of Albany, 3 Paige, 213. S. C. in error, 9 Wend. 571.) They had no power to construct a pier or basin in front of the docks of the city, or do any thing towards its construction, or improve the basin after the work was completed either by the state or individuals. It is true that the case shows that the corporation had sold all its interest in the wharfage when collected; reserving, however, the right and power to regulate the rates, and how it should be collected: How did the corporation possess the same rights and powers subsequent to the passage of the act of 18231 Did the act alter, enlarge or abridge them ; or extend the corporate powers to new subjects, and authorize their exercise in new modes and forms ? If so, then it altered the corporation, otherwise not. In the cases heretofore decided, it is assumed and conceded that the act in question did alter the corporation, though the effect of such alteration upon the con *55 stitutionality of the act itself was not the point in judgment. In Hart v. Mayor &c. of Albany, (3 Paige, 213,) the chancellor says: “ The act of 1823 which directs the manner of constructing the basin and pier, and makes a different disposition of a part at least of the wharfage, is inconsistent with the former rights and powers of the corporation.” In the same case on 'error, Mr. Justice Sutherland remarks: “ The act in some respects does limit the power and affect the previous rights of the corporation.” (9 Wend. 586.) We think that it is a. question admitting of no real doubt, that when the act left the hands of the legislature and became a law, the corporation was shorn of some of its former power, and that in one or two respects, new powers and duties were imposed. Before the act, and the construction of the basin under it, the corporation had power to charge and impose anchorage and wharfage on all descriptions of water craft lying at the wharves or in that part of the river opposite thereto, whether used upon the canal or not. It was abridged of this power by the express terms of the law, which provided that no wharfage or other charge should ever be exacted from canal boats or other craft entering from the canal and using the waters of the basin, or passing through the same into or from the Hudson river, or for lying alongside the pier or bridges. So also, before the act, the corporation possessed the power of regulating the rates of wharfage by ordinances made from time to time in view of the exigencies of commerce. The act took this power away, and fixed the rates unalterably. It was the clear intention of the legislature, which the act successfully carries out, to destroy the power of the corporation ever to legislate as to the rates of wharfage; and, to secure a benefit to individuals that should engage in the enterprise of constructing a pier, by fixing the rates unalterably through the exercise of state legislative power. So also, before the act, the corporation had the power to appropriate the wharfage as it deemed best. This power it had attempted to exercise in respect to the middle or inner docks. The act stripped it of the power and compelled payment of one half of the wharfage to persons designated by the legislature. The powers of a collect *56 ing agent or trustee for the pier owners was conferred on the corporation, and it was compelled to assume the responsibilities of that mere private relation. The act compelled it to discharge its duty in this respect through a dock master or wharfinger, and took away its right of doing so through another officer, however expedient. That question was no longer to be submitted to the judgment of the common council, the legislature assuming to decide it once for all time to come. Thus the act abridged the powers of the corporation in some respects, and in others enlarged its powers, and applied them to new subjects, and thereby altered it. In Stanton v. Stanton, (which was a case growing out of the work authorized by the act of 1823,) this question of what would amount to an alteration of the corporation was involved. The basin formed by the construction of the pier had filled up so that its beneficial use to the state and others was measurably impaired. The pier owners who claimed and exacted one half of the wharfage for entering the basin, and canal tolls, likewise neglected or refused to improve it. In 1835, the legislature passed an act, by a majority vote, authorizing the common council of Albany to make an additional opening in the pier, and to excavate and clean the basin with the view of improving its navigation; the expenses of which improvement were to be assessed and apportioned upon such real estate as was deemed to be benefited thereby. These assessments were, by the act of 1835, and others amendatory thereof, declared to be a lien upon such real estate, and if not paid were ultimately to be collected by the corporation by a public sale of the lands so charged. The defendant’s lot was assessed and sold' under the assumed authority. The only point insisted'on by the defendants was that the acts altered the powers of the corporation, by extending them to new subjects, and authorized their exercise in new modes and forms, and not having been passed by a two-third vote were void, and that necessarily all acts and pro^ ceedings of the corporation under them were invalid. The supreme court held, and its decision was subsequently affirmed by the court for the correction of errors, that the acts altered the corporation of the city. “True,” says Mr. Justice Beardsley, *57 " it was a body politic before, and these acts would make it no more. It would still be unchanged in its existence, but its attributes would be changed, and that change would necessarily be an alteration of the corporation itself.” (See MS. opinion of Beardsley, J, in Stanton v. Stanton; Laws of 1835, p. 191; Id. 1836, p. 186 ; Id. 1837, p. 519.) This decision led to the passage of the act of 1849, providing for the indemnification of the city by the state; the payment of a specific sum to the pier owners in lieu of tolls as before paid on canal boats, and repealing so much of the act of 1843, as directed canal tolls to be collected and paid to the pier owners ; the confirmation of the grant of the land under water on which the pier stood ; the transfer of the ownership of the basin to the state, and devolving its care and charge upon the canal commissioners, and the keeping of the pier in good repair on the owners of the pier. (Laws of 1849, ch. 200.)
The act, therefore, in our opinion, altered the corporation ;■ and it was passed by a mere majority vote. But it is urged that the corporation consented to the act; that it is to be regarded and treated as a compact between the state and the common council; that the legislature being desirous to subserve the exigencies of commerce by authorizing the erection of a pier by private enterprise, made certain propositions to the common council, to which their assent was necessary and was required ; that with respect to these the act does not profess to have the character of a law or enact the provisions by its own force; that the consent given by the corporation had all the effect of an ordinance of the common council and in fact was one; that the provisions derive their validity wholly from the act of the corporation in assenting to them; and that the common council by assenting have waived all objections to the constitutionality of the act, and that no other person can make them. We have already said that the plaintiff claiming to recover under the act of 1823 alone, the defendants may rightfully raise the question of its constitutionality upon any ground ; and the propositions embodied above with respect to the character of the act, and the effect of the consent of the common council, have certainly the *58 merit of novelty. The idea that the common council by giving their consent had actually exercised legislative power:' that what the legislature did, so far as the rights and powers of the municipal government were to be affected, was the act of the common council alone, and that the law possessed a semi-character, partly enacted by the state legislature, and partly by the common council of the city of Albany, is quite novel; but its novelty is all that it has to rest on. The law was the sole offspring of a majority of the legislature, and if the consent which it required from the common council transformed the thing into a compact, the effect of which was an alienation by the corporation of some of its powers, a question would arise whether the corporation could alienate any of its legislative or executive powers and duties by contract, bylaw, or otherwise, except under the authority of a statute passed by a two-third vote. We think it could not. In the case of the Presbyterian Church v. Mayor &c. of New York, (5 Cowen, 538,) it was expressly determined that the corporation could not abridge its legislative powers by contract. So also in Gozzler v. Corporation of Georgetown, (6 Wheat. 593,) Marshall, C. J., observed: “ A corporation can make such contracts only as are allowed by the acts of incorporation. The power of this body to make a contract which should so operate as to bind its legislative capacities forever thereafter, and disable it from enacting a by-law which the legislature enables it to enact, may well be questioned. We rather think that the corporation cannot abrogate its legislative powers.” In Britton v. Mayor &c. of New Work, it was held that it- was incompetent for the corporation to tie up or embarrass the execution of its public duties, wdiether legislative or executive, by contract or otherwise ; that it was not in the power of the common council to bind its legislative capacities by any private arrangements or stipulations, so as to disable itself from enacting any law that might be deemed essential for the public good. (MS. opinion of Nelson, C. J, in Britton v. Mayor &c.) These propositions require no argument. If a corporation may by contract, by law or otherwise, alienate its legislative powers and duties, there might soon be an end to all legislation under its charter. “ If *59 it were practicable,” says Nelson, C. J., “for the common council to divest themselves, of all power and discretion over any one public duty of which they áre the sole depositary by the charter, and to place it permanently in the hands .of another, I do not see but the same thing might happen to all. It would be impossible to distinguish. A consideration of the nature of the duties, and the object and purpose for which granted, forbid all idea of any power on the part of the corporation to divest itself of the right to exercise a constant control and supervision over the execution of them.” (See Auburn Academy v. Strong, 1 Hopkins, 278.) So that construing the consent of the corporation of Albany to the act of 1823, as an executed agreement to alienate its legislative and executive powers, having no power to do so, it would add nothing to the validity of the statute, or make constitutional what was before an unconstitutional exercise of legislative power.
But we think that if the common council had possessed the power to consent to an act altering the corporation, such consent would not obviate the objection that the act was passed by a majority vote. The constitutional provision does not except bills passed on condition that the corporation shall consent, but applies universally to every bill altering a body politic or corporate. The object of the provision was not merely to secure corporations from legislative attacks, but also to protect the corporators and the public ; and it would be rendered comparatively useless by excepting cases, when those who wield the corporate power for the time being consent.
Our conclusion is, that the act of 1823 altered the corporation of Albany. This seems to be the view entertained heretofore by those judges who have taken occasion to speak on the subject. It is quite apparent also, that the legislature supposed that they were by the act altering the corporate powers of the city, but that if the corporation consented it might be constitutionally passed by a majority vote in both houses. The act does not appear to have received the assent of two-thirds of the members elected to each branch of the legislature, and was not therefore passed in accordance with the constitution. It is *60 inoperative and void. As the plaintiff claims to recover wharf-age from the defendants by virtue of the provisions of that act, it necessarily follows that the action is not sustainable.
The ownership, care and charge of the basin, having been, in 1849, transferred to the state ; the pier owners released from any obligation in respect to it; a gross sum of thirty thousand dollars being paid to them by the state in lieu of canal tolls which they claimed to receive under the act of 1823; the grant of the land under water on which the pier was erected being confirmed to them; their claims against the state liquidated and no duty charged on them, except to keep the pier in repair; the legislature passed the statute of 1850, releasing all vessels navigating the Hudson river and entering the basin, from the payment of wharfage to the pier owners, unless they came to, laid at, or made fast to the pier on either side. If this were a constitutional act, then the defendants are not liable, as their vessels, although they entered the basin, at various times, in the seasons of 1850 and 1851, did not come to, lie at, or make fast to the pier. The act is not liable to the objection that we have just been considering, as the restriction was removed by the constitution of 1846. It is urged, however, that it conflicts with the provision in the constitution of the United States, which forbids a state from passing any law impairing the obligation of contracts. (Const. U. S. Art. 1, § 111.) The argument is, that the act of 1823 was in effect a contract between the state and the pier owners, assented to-by the city of Albany-by which, in consideration that the pier owners would erect a‘ pier and thereby form a basin, they should be entitled to, and receive, certain wharfage from vessels entering the basin and lying in it; that this contract was complete and executed prior to the act of 1850, which attempts to repeal and rescind, and not merely impair, but utterly destroy its obligation. If the premises on which the argument is based be correct, and there was a valid and subsisting contract between the state and the pier owners in 1850, by which the latter were entitled to' claim wharf-age from any vessel entering the basin from the Hudson river, the statute of 1850 would fall within the constitutional restriction, *61 and be necessarily void. But can the act of 1823 be fairly construed as a contract between the state and the pier owners ? The pier, by the terms of the act, was to be constructed by commissioners named in it, who were primarily to raise the funds by voluntary subscription of individuals in Albany or elsewhere. These subscribers were to be reimbursed by a sale of the pier after it had been finished and divided into lots. The persons who might become purchasers at the sale were not restricted to those originally subscribing to the fund for its erection. The purchasers of lots were not organized into a company or association ; and the state did not profess to deal with them in the accomplishment of the work contemplated by the act. There was no contract therefore, in terms, between the state and those who should purchase and hold pier lots ; and I cannot well perceive how one can be implied. True, the act established certain rates of wharfage to be imposed on vessels entering the basin, to be collected by the corporation of Albany, and a moiety thereof distributed among those persons who should subsequently become purchasers and proprietors of pier lots ; but the pier, in accordance with the act, was to be built by commissioners, from funds voluntarily subscribed, and the subscribers reimbursed by a sale of it in lots. This was done, and it may well have happened under the provisions of the act, that not a single original contributor became, on a sale of the pier, a proprietor. How, therefore, can it be said that a moiety of the wharfage was, in contemplation of the legislature, to form any part of the consideration for the erection of the pier and the consequent formation of the basin 1 Or, how can any contract be implied between the state and the subsequent purchasers of pier lots ? Certainly, not legitimately from the terms and provisions of the act. The act was singular in its features. Looking at it, at this distant day, we can scarcely avoid the conclusion that the legislature aimed to approach as nearly as possible to the creation of a corporation to construct the work, without actually creating one, as that would require a two-third vote, which, probably, it was impracticable at the time to secure. The act did not profess to incorporate the original subscribers to the fund *62 for the erection of the pier, or those who subsequently became purchasers. In its provisions it lacked the legal characteristics of a contract between the state and those who should become purchasers of pier lots. The state being unwilling to. erect the pier as a public work, was disposed to give encouragement thereto as a private enterprise. Hence, as an inducement to subscribe to the fund for its erection, (and it may be with the latent expectation that the original subscribers would be the eventual owners of the work,) the rates of wharfage wrere doubled, with a provision that one half should be paid to the proprietors of pier lots. This provision is rather to be regarded in the light of- a gratuity or bounty offered on the part of the state to those persons who would engage in the enterprise, than constituting any part of the consideration of a contract for the erection of the pier. As I regard the act of 1823, a contract between the state, the city of Albany and the pier proprietors cannot be deduced from any reasonable construction of it, even if that act were deemed to- have any validity; so, that the act of 1850, granting the right to vessels to enter the basin without the payment of wharfage, for so entering, after the basin had become the exclusive property of the state and the pier owners had released any interest they had therein, pursuant to the provision of the act of 1849, did not fall within the restrictions of the federal constitution. Indeed, the very able counsel who argued the case at bar on behalf of the plaintiff, scarcely alluded to the objection, though appearing in the printed points of a distinguished lawyer, who, since the argument, has departed from our midst, bequeathing to us the accumulated fruits of his vigorous intellect and unparalleled industry. It was Urged, principally, that the act of, 1850 is made a part of the act of 1823, and is liable to all objections raised against that act.
But as a matter of fact, it is not true that the act of 1850 is made a part of that of 1823. It undertook to repeal so much of the act of 1823, as gave any wharfage for entering the basin to the proprietors of pier lots, unless the vessels came to, laid at, or made fast to the pier on either side. But it was not in *63 terms or otherwise made part of the act of 1823. Nor is it liable to what we deem a valid objection to the act of 1823. It was passed since the adoption of the constitution of 1846, abrogating the provision contained in that of 1821, requiring the assent of two-thirds of the members elected to each branch of the legislature to a bill altering a body politic or corporate. A majority vote of all the members elected to each branch of the legislature was then sufficient. But assuming the ground taken by the plaintiff’s counsel, that the act of 1823 was constitutionally valid, then the only objection that can be raised to the validity of the statute of 1850, is that it impairs, by destroying, the obligation of a contract entered into between the state, the corporation of Albany, and the pier owners, by which it was agreed that the pier owners for all time to come were to receive a moiety of the wharfage, fixed by the act of 1823, as a consideration or compensation for erecting the pier. We do not think that the act of 1823 is evidence of any such contract. It follows that the statute of 1850 is valid, and therefore, even if we were mistaken in our view of the constitutionality of the act of 1823, as the defendants’ vessels did not come to, lie at, or make fast to the pier on either side, there can be bo recovery by the pier owners against them.
[Albany General Term,
September 1, 1856.
There should be judgment for the defendants.
Harris, Wright and Watson, Justices.]