JOHN J. ROHRBACHER VS. MAYOR AND ALDERMEN OF THE CITY OF JACKSON.

1. RETAILING: RESTRICTION. *Power of the legislature. Act of 1874.*

The legislature has the power to regulate the retail dealing in, and sale of, intoxicating liquors. All of the states have legislated upon the subject, some by total prohibition, and others by dealing with the subject under rules and regulations, in the interest of morals, sobriety, industry and good order. The state may regulate it, or it may absolutely prohibit it.

2. SAME: SAME: *Application by petition of males over 21, and females over 18 years of age.*

The statute of 1874 requires that the application must be supported by a petition of a majority of the male citizens over twenty-one years, and a majority of the female citizens over eighteen years of age, resident, etc. It can be no objection that the females are not voters. The legislature might require the signature of a majority of freeholders, some of whom might not be voters, and some of whom might be females; or the legislature might, in their wisdom, refer the whole question to the discretion of the board.

3. SAME: SAME: *No judicial power can regulate the requirements for license to retail.*

The judiciary cannot interpose and pronounce judgment upon the expediency and fitness of rules, which are exclusively committed to legislative choice and discretion. Before the court can declare a statute inoperative, it must be pointed to some provision of the constitution which it

violates. The policy of the legislation in adopting rules and regulations for the granting of the license, is wisely left with the law making department.

4. SAME: *Optional law.*

The act of 1874 is not an optional law. It does not propose to leave to a vote the question of the issuance of license. The power of the board of supervisors, or mayor and aldermen, is not made dependent upon a vote in favor of its exercise. The application of one person may be sustained whilst the application of another may fail.

Per TARBELL, J., dissenting.

I.

5. *Necessary to the passage of an act of the legislature.*

It is fundamental to the validity of every act of legislation: 1. The presence of a majority of either house of the legislature; and, 2. The act must have "passed" both houses. Any act appearing in the published laws is a nullity, if it is obnoxious to either of these conditions.

6. *Certificate of passage is only prima facie evidence.*

The certificate of the secretary of state to laws filed in his office is only *prima facie* evidence of their validity.

7. *Journals are not records under our constitution and laws.*

Legislative journals are not "records" importing absolute verity unless made so by constitutional or statutory provision, which has not been done in this state.

8. SAME: *English practice.*

In the English practice there is a legislation "Journal Book," and a "Parliament Roll." The latter is called then a "high record," and imports absolute verity, while the former is merely a book of "remembrances" for forms of proceedings to the "record." Hobart says, "journals are no records, but remembrances for forms of proceedings to the record; * * the journal is good use for the observation of the generalty and materiality of proceedings, and deliberations as to the three readings of any bill, the intercourses between the two houses and the title; but where the act is passed, the journal is expired. * * General acts are always enrolled by the clerk of the parliament, and delivered over in to the chancery; which enrollment in the chancery makes them the original record," or "high record," importing absolute verity.

9. *Acts do not denote absolute verity.*

With us, legislative acts, when certified and approved, are filed in the office of secretary of state, but by no law or rule do they then become an "original record," "high record," "parliament roll" or such record as denotes absolute verity.

10. SAME:  *Impeachment for fraud.*

Conceding legislative journals to possess the character of absolute verity, they are no more sacred than the judgment of a court of record, which may be impeached for fraud, and this is the proposition at bar, a question never before presented to any court. In all the adjudications, the question has simply been as to the right of the courts to test the validity or accuracy of acts by reference to the legislative journals. The courts have never been asked to go further.

11. *English rule does not obtain in this country.*

Popular liberty in America protests against the adoption of the English rule on the subject under consideration, and demands that the proposition involved shall be confided to the judiciary, which in this country has ever been the faithful guardian of the true principles of the constitution.

12. *The law reaches the legislative branch.*

We live under a government of laws, reaching as well to the legislative as to the other branches of the government, and if we wish to uphold and perpetuate free institutions, we must maintain a vigilant watch against all encroachments of power, whether arising from mistake or design, and from whatever source they may proceed.

13. *Courts will take jurisdiction.*

There is no more delicacy or danger in the courts taking jurisdiction of cases of this character, and should be no more hesitation than in any involving the validity or constitutionality of statutes for any cause. The danger lies in refusing their jurisdiction.

II.

14. *License to retail contingent.*

A statute empowering local authorities to grant or refuse a license for the retail of spirituous liquors is the delegation of legislative power, and it is legislation dependent upon a contingency. The license law is lifeless until vitality is infused into it by the will of those upon whose consent it is contingent.

15. SAME:  *Will of the people.*

It is immaterial by what mode the will of the people is obtained, whether by an election or by petition.

16. SAME:  *The contingency must not be arbitrary.*

The contingency upon which a law may be made dependent must be equal and fair, moral and legal, not opposed to sound policy, nor merely idle and arbitrary. The requirement as a condition to the grant of a license of the consent of a majority of females over 18 years of age, while a majority of males over 21 years of age only is required, is unfair and une-

VOL. LI. — 47

qual, while the enforced interposition of the mass of females is opposed to sound policy; in its results, immoral and illegal, and a mere idle and arbitrary regulation. Hence, is unconstitutional.

17. SAME: *Legislation restricted.*

It cannot be questioned that there is a limit to the restrictions which legislation may impose as the condition of a license. If there is no limit, the grant may be made to depend upon the females of a particular church, or color, or any other idle and arbitrary condition.

18. *Right of a female to participate in our civil affairs.*

Looking to the origin, or organization of our institutions, males, by prescription only, have the right to participate in the management of our civil and political administration, and until such privilege is conferred by constitutional amendment, this right cannot be conferred upon females by legislation.

19. SAME: SAME: SAME.

The right of entire prohibition is too well settled to be questioned, confined to voters and heads of families, including female heads of families; the law may impose the consent of any portion of these as the condition of a license, but the participation of the mass of females in the administration of this law is obnoxious to the constitution as it now stands.

20. *Present policy demoralizing.*

As a policy, the present statute regulating the license system is improvident and pernicious, and demoralizing, as conceded by the friends of temperance.

[NOTE. — The syllabus to the dissenting opinion was prepared by Judge TARBELL, and published as prepared, at his request. — REPORTERS.]

ERROR to the Circuit Court of *Hinds* County.

Hon. GEO. F. BROWN, Judge.

This was a proceeding by *mandamus* in the circuit court to obtain a peremptory writ of *mandamus* against respondents, commanding them to grant to petitioner a license to retail vinous and spirituous liquors in the city of Jackson. Petitioner alleges that he had complied with the law (Code of 1871) by procuring to his petition the signatures of a majority of the male voters of the city, but that he had not the names of any females on his petition as required by act of the legislature, approved April 6, 1874.

The petition avers that the pretended act of April 6, 1874, was

never passed and approved as required by law; that the same was never enrolled by any authorized person; that at the moment of the adjournment of the legislature *sine die*, pursuant to a joint resolution of both houses, the bill was under discussion on a motion to amend and a motion to table that proposition; that the bill was enrolled by some private person having no authority, and hurried to the governor by the friends of the measure, and signed by him and reported to the house as signed whilst a member occupied the floor debating that pending proposition.

Respondents appeared and filed an answer, in which they concede that the petition contained the names of a majority of the male voters of the city; but set up the recent act above referred to in avoidance of the duty of the board to issue license as prayed for, averring that said act was duly passed according to law, and that the same is valid and constitutional. The court below rejected all proof as to those facts, and made an order refusing a peremptory *mandamus*, and dismissed the petition at the cost of the petitioner; and the case comes to this court on appeal.

The following errors are assigned:

1. The court below erred in refusing to receive and consider the evidence offered on the part of the defendant.

2. The court below erred in rejecting the prayer of appellant, and refusing the relief prayed for.

3. And for other errors to be stated on the hearing.

*Frank Johnston*, for appellants:

The constitution of Mississippi restricts the right of voting to male citizens of the age of twenty-one years and upwards, etc. Const., art. VII, secs. 1, 2. The act of April 6, 1874, extends the right of voting, in substance, to females of the age of eighteen and upwards. This act gives to females (minor females) the right of voting, and violates the constitution. It gives them a controlling voice in this great question of domestic policy, though that power is exerted through the mere medium of a written petition, the effect is the same as though it were by ballot. 1 Bur. L. Dic., 536; Bouv. L. Dic., 611. The act of April 6, 1874, should be

considered according to its substance. The act was a fraud on legislation. It was not passed in the constitutional mode. Const., art. IV, sec. 23. And otherwise it cannot become a law. We are aware that an act of parliament duly enrolled, signed and deposited in the archives, purports absolute verity, and that the same rigid rule was followed in Swann *v.* Buck, 40 Miss., 268. But see Brady *v.* West, 50 Miss., 68, in which that rigid doctrine is overruled. See Dwarris, pp. 64, 65, 66, 67, 325.

*Morris & Furlong,* on same side :

The act of February 17, 1854, p. 137, was in substance brought down to the codes of 1857 and 1871, delegating legislative power to the "legal voters" on this question, and has never been decided in this state; but similar acts have been decided in other states. Rice *v.* Foster, 4 Harrington (Del.), 479; Parker *v.* Commonwealth, 6 Penn. St., 507; Commonwealth *v.* M'Williams, 11 id., 61; State *v.* Field, 17 Mo., 529; State *v.* Copeland, 3 R. I., 33; Geebrick *v.* The State, 5 Iowa, 495; Maize *v.* State, 4 Ind., 343; Meshmeier *v.* State, 11 id., 484; Cooley Con. Lim. (2 ed.), 124. In all these cases, the statutes under consideration conferred power on a "legal voter," and yet they are held unconstitutional. All law making power is vested in the legislature (Const., art. IV, sec. 1), and none is delegated.

*Geo. L. Potter,* for appellees :

Can even the legislative journals be introduced to impeach a statute? See Swann *v.* Buck, 40 Miss., 268; Green *v.* Weller, 32 id., 650. As to the petition for license, the act of 1872 required an applicant for license to keep a tavern to produce a recommendation of six respectable freeholders, or housekeepers, to his good reputation, etc.; but this did not entitle the applicant to demand a license. H. C., p. 264, art. II, sec. 2. The act of 1842 makes the recommendation a prerequisite to the grant of license. H. C., p. 271, § 6. These laws were not mandatory, but merely authorized the grant. The code of 1857 gave power to grant license upon a petition of "a majority of legal voters" (Code, 1857, p. 197, § 4), and counter petitions were allowed.

The power of the legislature to prohibit or to regulate the traffic is settled. Bartemeyer *v.* Iowa, 18 Wall., 131. As to the power to prohibit and require petitions, etc., see House *v.* The State, 41 Miss., 737. The Code of 1871 adopted the policy of the Code of 1857. See §§ 2456–59. This act was permissive and not mandatory. The power to grant license is a discretion to be exercised for the public good. Mayor, etc., *v.* Bowman, 39 Miss., 671. The act of 1874, pp. 29, 30, adheres to the policy adopted since 1822. The applicant must be "recommended," not by six freeholders, etc., as by act of 1822, not by majority of legal voters as by acts of 1857 and 1871, but it goes a little further, and requires a majority of the male citizens of twenty-one years of age, and a majority of the female citizens of eighteen years of age. The act is constitutional. See 38 Miss., 652 ; 26 Vt., 356 ; 26 Wis., 291 ; Cooley Con. Lim., 117.

SIMRALL, J., delivered the opinion of the court.·

The only question seriously pressed is as to the validity of the " act " of 1874 to amend section 2459 of the Code of 1871, regulating the sale of vinous and spirituous liquors, etc. The act to which this statute is an amendment is chap. 56, Code 1871, none of which is affected by the legislation in question except sec. 2459. The first section of the chapter declares " it shall not be lawful for any person, except druggists and physicians under the restrictions hereinafter named, to sell vinous and spirituous liquors in a less quantity than one gallon without first having obtained a license therefor." The prohibition is to sell by the retail (less than a gallon), the privilege so to do, however, may be obtained on certain conditions.

The subject of retailing liquor has, from the earliest time, been subject to regulation. A compilation of the earlier statutes was made June 29, 1822. Hut. Code, pp. 264, 265, 266. The second section has the feature of requiring the applicant to be recommended by at least six respectable freeholders (in some cases, householders), and the third section exacts a bond. For cause, the

license may be revoked.   This was followed by the act of 1837, commonly called the gallon law, which repealed the former license laws and prohibited the sale altogether in less quantities than one gallon.   In 1842 the legislature restored the license system, prohibiting all not licensed from selling in less quantities than a gallon, and requiring the applicant to be endorsed as a respectable person by five freeholders, and bond to be given. Hut. Code, 270, 271.   This statute was substantially incorporated into the revision of 1857, with additions and alterations.   Among others, the applicant shall produce to the board of supervisors, or the town or city authorities, a petition signed by a majority of the voters resident in the police district or in the incorporated city or town which, with the counter petition, shall lay over one month, and if a majority of voters shall petition against such license, it shall not be granted for twelve months after such petition is so presented.   Art. IV., pp. 197, 198.   The license may be revoked if the party shall become an unfit person, or shall violate the provisions of the act.  Art. VII, p. 198.  Bond must be given that gaming, drunkenness, or disorderly conduct will not be allowed, but an orderly, peaceable house will be kept.  Chapter 56 of the present code is in substance the same.

This review of the legislation indicates that the policy of the state has been to prohibit, in general, the sale of intoxicating liquors by the glass, except that the special privilege was authorized to be granted to applicants who supported their claim by proper vouchers of being respectable persons, and who gave bond that they would not violate the statute, nor suffer disorder or drunkenness on the premises.   The assumption in all this legislation has been that it would be unwise and detrimental to permit the promiscuous, unrestricted sale of vinous and spirituous liquors by the small or the drink, and that the privilege should only be granted to the discreet and reputable, and that, too, under the security of bonds and subject to revocation for good cause.

Art. 2459, like a corresponding section in the statute of 1857, demanded that the petitioner for license should support his claim

with a recommendation signed by a majority of the legal voters of the police district, or of the incorporated city or town that the applicant is of good reputation, and a sober and suitable person to receive a license.   Opportunity is given of fully canvassing the matter by allowing counter petitions, etc.   Except when the sale by the glass was totally prohibited by the act of 1839, the law from 1822, forward, has always insisted that the privilege should only be granted to a fit person, and the evidence of that under the older statutes should be furnished by six freeholders, or five freeholders, and under the later statutes by a majority of the legal voters of the locality,  and under the last amendment of 1874, by a still larger number of persons residing in the district, town, or city, those more immediately affected by it.   It would seem that it ought hardly to be questioned at this day that it belongs to the police power of the state to regulate the retail dealing in, and sale of intoxicating liquors.   Perhaps all the states have legislated on the subject; some by total prohibition, and others by dealing with the subject under rules and regulations.   Such legislation rests on the popular conviction that it is to the interest of morals, sobriety, industry and good order that the state should hold the traffic under surveillance.

The state may deal with the subject by absolute prohibition, or by regulations.   Bartemeyer v. Iowa, 18 Wall., 129; License Cases, 5 How. (S. C.), 504; Cooley Const. Lim., 581–2–3. The police power extends to wholesome restrictions on property and individuals, in order to secure the general health, comfort and prosperity of the state.   The power of the legislature cannot be questioned.   Thorpe v. R. & B. R. R. Co., 27 Vt., 149 ; Commonwealth v. Alger, 7 Cush., 84.   If the state may require the recommendation of five or six freeholders, it may enlarge the number to ten or fifty.   In a word, it may, in its discretion, lay down the terms upon which the license may issue.   During all the years that these several statutes have been in force, with the many indictments and litigation that have grown out of them, we have been referred to no case that throws doubt or suspicion on their

validity. In House *v.* State, 41 Miss., 737, so far from casting suspicion on art. IV., p. 197–8 of the code of 1857, which is the original of section 2459 of the present code, it was expressly held that the grant of license "without the petition of a majority of the legal voters resident within the city is null and void. The court says (pp. 742, 743) that the instruction of the circuit court, which embodied that idea, announced a correct principle of law. It will be observed that the statute of 1857 applied more stringent terms to the applicant for license than the former laws, nor was it debated at the bar, or alluded to by the court that it was not as completely in the competency of the legislature to require the petitioner for license to be supported by a majority of voters, as by the few householders, or freeholders under the prior laws.

The statute of 1874 makes a further enlargement of the countenance and support which the applicant must have. He must produce a petition, signed by a majority of the male citizens over twenty-one years, and a majority of the female citizens over eighteen years of age, resident, etc. It would not be controverted if the legislature might require a majority of the legal voters. It could, in its discretion, have increased the number to two-thirds or three-fourths, or it might have returned to the old statutes and have insisted upon the consent of two-thirds, or a majority of the freeholders or householders. If that be true, upon what rule of constitutional law shall it not be allowed to demand, as in this statute, the consent of a majority of male citizens over twenty-one, and of females over eighteen years of age.

Whether the recommendation and consent of any person resident in the district or town or city shall be obtained or not, or whether the whole matter shall be referred to the judgment of the board of supervisors, or town or city authorities, is purely a matter for the wisdom of the legislature.

However the question may be elaborated, it comes to this complexion at last: Has the legislature the power to regulate the sale of vinous and spirituous liquors? The answer is, that it has done so from the beginning until now, and no decision has been re-

ferred to which so much as doubts the power. These rules and regulations have been variously changed from time to time, at the pleasure of the representative body. Can the judiciary interfere and pronounce judgment on the expediency and fitness of rules which are exclusively committed to the legislative choice and discretion? A court must be pointed to some provision of the constitution which a statute violates, before it can declare it inoperative. "As to the policy of legislation, the judiciary have nothing to do; that is wisely left to the lawmaking department. A court only consults the policy of a law, as an aid to attain the legislative meaning and intent." If a law is touching a subject not given up to the national government, nor prohibited by the federal constitution, nor excepted out of the legislative power in the state constitution, can the judiciary listen to argument founded upon its supposed inutility and inexpediency? It involves the inadmissible proposition of the judiciary sitting in review upon legislative wisdom and discretion. Donnell *v.* State, 48 Miss., 679. The premise is that the legislative control over the subject is plenary. If terms are imposed which are harsh and unwisely chosen, the courts cannot interfere to cure or correct legislative indiscretion, nor has it the right or power to suggest other regulations deemed more suitable. The People *v.* Simeon Draper, 15 N. Y., 545. "If a particular act of legislation does not conflict with any of the limitations or restrictions of the constitution, it is not in the power of the courts to arrest its execution, however unwise its provisions may be, or whatever the motives that led to its enactment. The remedy for bad legislation is better afforded by frequent removals of the legislative body, than any that can be given by the courts."

"The representative body is entrusted with the responsibility of consulting the public interest and carrying out public policy by the enactment of laws. The power to review their fitness and wisdom does not belong to the courts. In 1857, the legislature said a majority of the voters must petition for the license. In 1874, it has said more than that. The question before the court

is not as to the fitness and expediency of the law, but whether the legislature was competent to pass it. The argument made against the validity of the statute of 1874 is, that it submits the question of license or no license to a vote, which, it is urged, involves an abnegation of legislative power, and a devolution of it upon electors, which cannot be done; and, more than that, it authorizes females, some of whom are minors, to have a voice in the election. Is the law fairly obnoxious to that criticism? It is much freer of that objection than the statute of 1857, under which House's Case was decided. "All male citizens over twenty-one" is a larger denomination than "voters." It embraces all voters, and many more besides. The inclusion of females over eighteen shows conclusively that the petition for license was not meant to be limited to "voters," and that the idea of an "election" by the class entitled to "vote" was not in the mind of the legislature. The principle upon which the law rests is, that the license shall not issue unless a majority of the community, who have reached that maturity of mind that qualifies them to judge of the quality of the act and its effects, shall petition for it. Females who participate have attained a marriageable age, and are profoundly concerned that those with whom their future may be linked should be surrounded with influences that contribute to sobriety, thrift and prosperity. That may have been one of the motives of associating them with the males over twenty-one in the right to petition for or against the license. We are not called upon to say that the conditions are unreasonable. This statute is not framed upon the theory of what are called optional laws. It does not propose to submit the "question" to a vote, whether license shall or shall not be granted in the county, or incorporated city or town. The power in the board of supervisors, or the mayor and aldermen, is not made dependent upon a vote in favor of its exercise. The statute grants to these municipal bodies authority to issue license to those applicants who present a petition or recommendation signed by the number of persons named. The application of one person may be thus sustained, whilst another may not be.

Just as under the earlier statutes, one person might procure the recommendation of the freeholders and householders, and another might not.  As, under the act of 1857, one person might be recommended by the majority of the voters, whilst others might altogether fail.  So, too, under any one of these statutes, there might be the requisite recommendation signed; but the party might fail of his license from inability to give the bond.

The parallel of the statutes of 1857, of 1871, and the amendment of 1874, is found in the act of 1833, in reference to the leasing of the sixteenth section (the school lands) leases for ninety-nine years which should be granted by the township trustees, on a request of "a majority of the resident heads of families" (minors not excepted).  Here the act could be done on "consent obtained" of heads of families, including minors.  Some of these heads of families might be females, aliens.

Under the statute of 1822, and the early amendments, the freeholders or householders who vouched for the petitioner for license might be females, adults or minors.  The statutory qualification was "freeholders" or "householders."

Legislation on this subject has been tested in various forms.  Perhaps experience has shown that the police power of the state, whether put forth in the form of prohibitory laws, or in subjecting the retail traffic to regulations and restrictions, has not been able to suppress intemperance.

The general policy has been to entrust the sale of intoxicating liquors by the drink to those only who could procure evidence of good reputation, and then to put them under bonds, and surround them with such checks as would best provide against excesses and abuses.

A wisely regulated license system is perhaps the best that the state can do.

Whether the existing law is of that character is not our province to say.  The rest may be left to those religious and moral influences which continually advance and improve our civilization.

There is no error in the judgment; let it be affirmed.

TARBELL, J., dissenting.

## PART I.

The questions for consideration in this case being of more than usual importance, it is to be regretted that they grow out of a subject with reference to which two large classes are apt to become active partisans. Although in theory and practice devoted to temperance, almost to the extent of total abstinence, I entertain no other than perfectly impartial and independent views, which, according to my best judgment, are strictly judicial; at least, in the discussion which follows, I am unconscious of other than legal considerations.

This case is brought here to test the validity and constitutionality of an act published in the laws of 1874, ch. 24, p. 29, whereby a license for the sale of vinous and spirituous liquors must be recommended not only by a majority of males over 21, but by a majority of females over 18 years of age. For the prior legislation of our state on this subject, see acts 1822, Hutch., 264; acts 1842, id., 271; Code of 1857, p. 197, ch. 20; Code of 1871, ch. 56; and then follows the act involved herein, as an amendment to § 2459 of the Code of 1871.

The pleadings in the court below present two propositions, viz: 1. That ch. 24, p. 29, Laws of 1874, never reached its final passage through the legislature, and is therefore a nullity; and 2. That the said act, if it ever "passed," is in conflict with the constitution and void.

On the trial, it was proposed to show by parol evidence that the act involved never reached a final vote in the house of representatives. The act having been certified by the speaker to the governor, and approved by him, and it being understood that the journals of the house recited its passage, the scope of the evidence offered was, in effect, a proposition to impeach the validity of the act by parol evidence showing that the certificate of the speaker and the recital in the house journals were false and fraudulent.

Judgment was rendered in the circuit court against the plaint-

iff in error, who thereupon brought the case to this court for review.

 Upon the proposition that the act (ch. 24, Laws of 1874, p. 29) never became a law, the question is, Can the legislative journals and the certificates of the presiding officers of the respective branches of the legislature, showing its passage, be impeached by parol evidence? In the consideration of this question, it must be borne in mind, as fundamental, that two prerequisites are vital to the validity of every act of legislation : 1. The presence of a majority of the members of either house of the legislature.  Const., art. IV, sec. 12.   2. The act must have "passed" both houses.  Const., art. IV, sec. 24.   Any act appearing in the published laws is a nullity if it is obnoxious to either of these conditions.   Hence, the public, the authorities, and the courts, may be placed in the monstrous attitude of enforcing an act which, notoriously and confessedly, is not a law, if the position assumed in the case at bar is maintained upon the technical ground that legislative journals cannot be impeached.   Contracts or judgments may be assailed for fraud.   Why not a published law?   The proposition is simply and only this; that an act appearing in the published laws may be assailed and annulled, on the ground that it never became a law by the final vote of both branches of the legislature, and in support of this proposition, that the legislative journals and certificates of the presiding officers of the several houses of the legislature, showing its passage, may be impeached by parol evidence as fraudulent and false.

There is no question that legislative journals may be inspected to test the validity or accuracy of acts assailed in judicial proceedings.   Should the journals show that the act was not passed by the requisite number of votes, or, that it never passed in fact, the courts will annul such an act; because, in such case, it is no law; it is equally no law in either case, whether it failed to receive the necessary number of votes, or was absolutely rejected or postponed by affirmative action.

If, however, on examination, legislative journals show the con-

stitutional passage of an act, can those journals be impeached by parol testimony? If so, how, when, and under what circumstances? An examination of very many cases discloses great diversity, if not uncertainty, of opinion in this country, as to the character and standing or status of legislative journals. They are characterized as "most uncertain data upon which to found a judicial determination of the rights of property, much more of great constitutional questions." Hunt v. Van Alstyne, 25 Wend., 605, and "besides, the hurry and looseness with which the journals are copied, and the little importance attached to the printed copies, necessarily impair confidence in their correctness." Hunt v. Van Alstyne, *supra*. Turley v. The County of Logan, 17 Ill., 152, is referred to as affording "a striking illustration of the unreliability of the journals of legislative bodies." In that case, according to the journals, a certain act had failed to pass, but had found its way into the published laws; its validity was disputed, and the courts were about to declare it void or inoperative ; but, before a decision was reached, the legislature had reässembled and corrected the journals, making them show its constitutional passage; this was certified to the courts; the correction and the law were both sustained. Legislative journals are "mere memorials — evidence for some purposes, perhaps, but not for all." Sherman v. Story, 30 Cal., 253.

Considering "the manner in which the journals are made up, and the rank of the officers to which that duty is entrusted," the proposition that these journals are reliable, and import absolute verity, is regarded as "startling." Pacific Railroad v. The Governor, 23 Mo., 363. "Accidents must of necessity be of frequent occurrence," in view of "the manner in which the journals are kept." 30 Cal., *supra*. "Journals are no records, but remembrances for forms of proceedings to the record ; they are not of necessity, neither have they always been ; they are like the dockets of the prothonotaries, or the particulæ to the king's patents." (The prothonotary and the "particulæ" to the king's patent are, literally, chief clerks, as defined in Bouv. L. Dic. and 1 Chitty's

Black., 280, top page.) "The journal is of good use for the observation of the generalty and materialty of proceedings and deliberations as to the three readings of any bill, the intercourses between the two houses, and the like, but when the act is passed the journal is expired." The King v. Arundel, Hobart, 244, top page, 109, side page, and similar expressions in numerous other cases.

The case referred to in Hobart is one of exceeding interest. The English rule is clearly defined therein : " General acts are always enrolled by the clerk of the parliament and delivered over into the chancery, which enrollment in the chancery makes them the original record " (Hobart, 246); while with us, acts, when certified and approved, are filed in the office of the secretary of state, whence they are published as laws. They have, in the practice of that country, what are known as the " Parliament Roll," and the " Journal Book." The former is a record import- ing absolute verity, while the latter is merely a book of "remem- brances for forms of proceedings to the record." Although "the journal were every way full and perfect, yet it hath no power to satisfy, destroy or weaken the act, which being a high record, must be tried only by itself, *teste meipso.*" Hobart, 248. Yet in that very case it was held that an act might be tested by refer- ence to the journal. The English doctrine and practice have a peculiar significance. The many adjudications examined during this investigation convey the impression that the distinction be- tween the record and the journal has not always been considered in this country. In the English system the one imports absolute verity ; the other does not. It is impossible not to perceive the significance of the distinction between the "journal" and the "record," in the solution of the question under consideration, the proposition being to impeach the legislative journals for fraud and not to assail an act for causes which might be tried by the record itself. Hobart, 250.

The distinction between "record" and "journal" is well de- fined by lexicographers, Webster and others, wherein this differ-

ence is made broad and clear.   The rules observed in Great Britain grow out of the institutions of that country; and in view of her systems of forms, ceremonies, routine and checks, a deliberately false certificate of the passage of an act is not only not supposable, but wholly improbable, if not impossible.   But in new states, where forms, routines and systems of checks are dispensed with; where officials are constantly changing, and where character, education and qualifications constitute no legal barrier to promotion, the chances of mistakes and frauds are · necessarily greatly increased.   The parliament of Great Britain is not subject to frequent changes; it is composed of the ablest men in the nation; presiding officers of the two houses are selected for their rank, learning and character; parliament is omnipotent, supreme, and not subject to a written constitution; there is no analogy between the institutions, circumstances and people of Great Britain and the institutions, circumstances and people of this country; there, in the language of WILSON, J., 2 Dall., 462, "from legal contemplation, the people totally disappear."   According to Blackstone, the "*jura summi imperii*' resides in parliament."   1 Com., 49. Its legislative power "is the highest authority which the kingdom acknowledges on earth."   Dwarr., 668; 1 Bl. Com., 185. But with us the case is entirely different; we have written constitutions, in which, to use the apt language of PATTERSON, J., in Van Horne's Lessee *v.* Dorrance, 2 Dall., 308, " the forms of government are delineated by the mighty hand of the people, in which certain principles of fundamental law are established.   * * Laws are the work or will of the legislature in their derivation and subordinate capacity.   *   *   The constitution fixes limits to the exercise of legislative authority, and prescribes the orbit within which it must move."   The people have delegated certain powers of sovereignty to the legislature, to be exercised strictly according to the written constitution; and any act exceeding that authority is void.   The legislature cannot " mould and model the exercise of its powers," irrespective of the constitution.   Story, J., 4 Wheat., 304; Hand, Senator, 2 Den., 380, 389.

In Great Britain even, the courts and king are subordinate to parliament; but in this country all departments of government, state and national, are subordinate to our written constitutions; and to the courts, conducted by a faithful judiciary, are confided those vast powers which are equal and essential to our condition, circumstances and institutions.   It will be seen that there is every reason why the parliament of Great Britain, in its omnipotence, should make its enactments a " high record," importing absolute verity.   On the other hand, popular liberty in America demands a contrary rule, and that the question under consideration shall be confined to the judiciary as the guardian of the rights of the people.

The thought which I desire to deduce from a contrast between the institutions of Great Britain and those of the United States, is perhaps best expressed by BRONSON, J., in The People v. Purdy, 2 Hill, 31 : " It has not been denied that the judicial tribunals of the state may, in some way, look beyond the printed statute book for the purpose of ascertaining whether bills coming within the two-thirds clause of the constitution have received the requisite number of votes ; and although I have felt a good deal of difficulty on that question, I am inclined to the opinion that such an inquiry may be instituted.   The question is no doubt one of great delicacy ; but if the courts have the right to entertain it, the duty is imperative, and we are not at liberty to shrink from its performance.   We live under a government of laws, reaching as well to the legislative as to the other branches of the government ; and if we wish to uphold and perpetuate free institutions, we must maintain a vigilant watch against all encroachments of power, whether arising from mistake or design, and from whatever source they may proceed."   These views of Mr. Justice BRONSON were subsequently approved by Chancellor WALWORTH, in the court of errors.   Purdy v. The People, 4 Hill, 384.

A legislative journal, therefore, although in some sense a record, does not belong to that class denominated in England a " high record," importing absolute verity, unless made so by constitu-

tional or statutory regulation. In one state, perhaps in two, the journals of the legislature are understood to be placed on this footing by constitutional provisions, as in Maryland and Illinois, and perhaps in Ohio.

In our state, acts which have "passed" and been approved by the governor, are filed in the office of the secretary of state, whose certificate is *prima facie* evidence only, of their validity as statutes. The question, in all the adjudications, has been as to the right to test, either the validity or correctness of published acts, by an inspection of legislative journals. The proposition at bar is for the first time before the courts. In the new constitution of Pennsylvania the legislature is empowered to confer authority for "suspending" laws ; a wise provision, which ought to be imitated in every state, with legislation defining the causes of suspension and the practice in such cases.

I maintain, however, that without constitutional authorization or legislation, the courts have jurisdiction over this subject, and may annul or suspend a published law for just cause; that the practice in such a case may be prescribed by legislation in the absence of express constitutional grant, and that the courts are unrestricted, save by organic and statutory prohibition.

Up to a recent period, the statutes and practice of the courts of New York closely imitated English precedents; hence, in that state, by acts of the legislature, the certificate of the secretary of state is made "conclusive evidence" of the existence of their statutes. Nevertheless, the impeachment of the certificate of the secretary of state, or the "record," as would be said in Great Britain, has been discussed by the judges, though the question is not understood to have been definitely adjudicated. Chancellor WALWORTH, in several instances, very cautiously declined to express an opinion, because not necessary to the determination of the causes wherein he refers to this question. Warner *v.* Beers, 23 Wend., 103, in which he says the point had not, up to that date (1840) been passed upon by the courts of New York, and he declines to express an opinion. The propriety of permitting a

statute to be assailed on the ground that it was not passed by the requisite number of votes, or, in other words, of allowing the certificate of its passage to be impeached, was reserved by the supreme court of New York, in Thomas *v.* Dakin, 22 Wend., 9, in language hereinafter quoted.

As late as 1842, the chancellor, referring to this subject, in Purdy *v.* The People, 4 Hill, 384, said : "I have been unable to find any cases in our own courts having a bearing upon this point, or indicating the manner in which this proof ought to be made, except the incidental opinions expressed by several senators in the case of Warner *v.* Beers. But Chief Justice PRATT held, in Rex *v.* Jefferies (1 Strange, 446), that it was competent to examine the parliament rolls to correct an error in the printed copy of the statutes; and Lord MANSFIELD held a similar doctrine in the case of Rex *v.* Robotham, 3 Burrows, 1472. If, then, the original acts of parliament could be resorted to, and read at the bar, for the purpose of correcting clerical or other errors in the printed copy, I see no reason why a similar practice ought not to be sanctioned for any other purpose. Judges are bound to take notice of a general law, and it is their province to determine whether it be a statute or not; for as against a general statute, *nul tiel record* cannot be pleaded, but it must be tried by the judges, who are to inform themselves in the best way they can ; and if there be any difficulty or uncertainty, they are to make use of ancient copies, transcripts, books, pleadings, or any other memorial, for that purpose." Dwarris, 630, 631. And if these may be made use of, why not the evidence of the speaker, clerk, and members, on oath ? With reference to the conclusiveness of the certificate of the presiding officer of each house to the passage of a bill, Chief Justice NELSON, in Hunt *v.* Van Alstyne, 25 Wend., 605, uses this language : "Would it be conclusive? It seems to me it would be so. There are only two modes of contradicting it: 1. By the journals of the two houses; and 2. By parol testimony. The presiding officer had all the benefit of the first ; the ayes and noes were taken and the journal made up under his supervision and control.

His means of ascertaining and determining the fact, when he declares the law to be passed, exceed those of any other tribunal that might afterwards be called upon to inquire into it.    Besides, the hurry and looseness with which the journals are copied, necessarily impair confidence in their correctness.  They are most uncertain data upon which to found a judicial determination of the rights of property, much more of great constitutional questions.  As to the second mode of contradicting the certificate, the evidence would, if possible, be still more fallible and unsatisfactory.  Indeed, we can scarcely imagine a case where, from its nature, the proof would be so subject to the doubtful and conflicting recollection of witnesses.   Nothing short of absolute necessity could justify a resort to it.    It would hardly deserve weight in contradicting the journal itself; much less the certificate of the presiding officer affixed to the law.   But it is unnecessary to pursue these views, as they are not material to the decision of this case.  They came up in the course of the examination as intimately connected with the subject.    But I do not desire to be understood as committing myself upon the question, if, on a future investigation, when it shall be directly involved, these views shall be found untenable."

In another case in the court of errors, Bradish, president of the senate, and Verplanck, senator, gave expression to views similar to those of C. J. Nelson.   Both spoke more at length on the question, but neither gave any reason or made any point not expressed by the learned chief justice of the then supreme court.   The question was discussed rather as concluded by the statute, making the certificate of the secretary of state conclusive, and the reasons of the opinions were rather in support of this statute, yet, that the question might arise in a mode compelling its adjudication as an original proposition.    Its incidental discussion arose in this wise :   The constitution of New York requires certain laws to be passed by a two-thirds vote of the legislature and to be so certified.   A case occurred in which two points were made, viz :  1. That the law required a two-thirds vote; and, 2. That the statute

involved was not so passed.    The question discussed was, as to the right to go behind the certificate of the passage of the act, and to inspect the journals of the legislature.    The case was determined on other grounds, and the question, now become of importance to us, was left in New York in the undecided attitude above stated.    Hence, we have only the individual views of some of the judges of that state.

It will be observed that C. J. Nelson expressly recognizes the right and duty in a case of " absolute necessity," to resort to the journals or to parol testimony to impeach the validity of a statute.    Other judges concurred in the exercise of this right in cases of necessity and great emergency.

Senator Verplanck, a gentleman and a lawyer of character and learning, as a member of the court of errors, in Warner v. Beers, *supra*, uses this language :    " It may possibly be that there may occur some special cases where a plea, formed to put in issue the validity of a statute, on the ground of the inherently and essentially defective mode of its enactment, might be sustained by a court anxious to obtain some great end of justice, not otherwise to be reached."

The senator refers to the mode of enactment.    The averment in the case at bar is, that the act was never enacted and is not a law.    The two cases are diametrically different.    Certainly, in this case, there is involved a " great end of justice not otherwise to be reached," than by investigation.

In Thomas v. Dakin, *supra*, the court say :    " We must, on this record, presume the general banking law to have been passed by two-thirds of all the members elected to both houses.    We must clearly do so until the fact is denied by plea.    The requisite constitutional solemnities in passing an act which has been published in the statute book must always be presumed to have taken place until the contrary shall be clearly shown.    Should the defendant withdraw his demurrer, and plead specially that the law in question did not receive the assent of two-thirds, as required by the constitution, it will then be in order to pass upon

the validity of such an objection." This is the language of COWEN, J., and seems clearly to recognize the power of the courts to inquire into the validity of a statute assailed, on the ground that it did not receive the requisite number of votes.

The general power of the courts to scrutinize the acts of the legislature is recognized in 23 Mo., 370, in these words: "We do not maintain that the legislature can prevent a scrutiny into its acts, which the constitution designed should be made, by any mode of authentication it may adopt." This is certainly a very broad and sweeping declaration. In that case, it was correctly held, that an act could not be assailed on the ground that the journals showed a departure from the constitutional forms of procedure, a widely different proposition from that at bar.

Senator Paige, who has few superiors as an accurate lawyer, reporter and judge, in Purdy v. The People, *supra*, said: "We have a right, I think, to go behind the printed statute book in order to ascertain whether bills have been constitutionally passed."

WILLARD, J., in The People v. Supervisors, etc., 8 N. Y., 317, says: "Where the objection to the validity of the law springs out of the failure of the legislature to comply with the provisions of the constitution, which is not apparent upon the act itself, it should be distinctly set forth in the pleadings. The adverse party should have an opportunity to controvert the allegation, and to prove a due conformity on the part of the legislature with the requirement of the constitution."

In Burr v. Ross, 19 Ark., 250, an act of the legislature was duly certified to the governor, approved by him, and filed in the office of secretary of state. The court, upon the statement of the speaker and clerk of the house, annulled the act as one which had never become a law, and this judgment was respected throughout the state as final and conclusive.

A case is found in California worthy of special attention. In violation of the constitution of the state, the governor approved an act of the legislature subsequent to the final adjournment of that body, ante-dating his certificate of approval, so that on its

face, as filed in the office of secretary of state, it appeared to have been approved while the legislature was in session.   The proposition was made to show by parol testimony the true date of the executive approval ; or, in other words, to impeach the certificate of the governor by parol testimony.   From the opinion of Chief Justice MURRAY, a liberal quotation is deemed justifiable on account of its independent, satisfactory and conclusive reasoning :

" We are called upon to decide whether the courts of the land, to whom belong the guardianship and exposition of the laws and constitution, have power to go behind the act itself to inquire whether the legislative or the executive, as a component part of the legislative power, have, in passing or approving such act, violated or disregarded the mode pointed out by the organic law of the land.   It may be well to remark here, that the rule laid down on the subject of parol evidence is entirely foreign to this case, and only applies to written contracts between parties, so that, if a legislative act cannot be impeached, it is in consequence of the high dignity and supposed absolute verity of the record, and not because of the rule referred to.   In fact, if a court cannot resort to parol evidence in such cases, the door to all inquiry is closed, as it is impossible, from the nature of the case, to obtain any other evidence in most cases that may arise.   I am of opinion that there is no difference between declaring a law unconstitutional for matters patent upon its face, though passed regularly, and a law apparently good, yet passed in violation of those rules which the constitution has imposed for the protection of the rights and liberties of the citizen.   If such matters cannot be inquired into, the wholesome restrictions which the constitution imposes on legislative and executive action become a dead letter, and courts would be compelled to administer laws made in violation of private and public rights, without power to interpose.

" The fact that the lawmaking power is limited by rules of government, and its acts receive judicial exposition from the courts, carries with it, by implication, the power of inquiring, how far those exercising the lawmaking power have proceeded constitu-

tionally. The weight and character of the testimony necessary to disprove the record may be difficult to determine, but once possessing the power, the court must proceed according to known rules. * * It is said that these decisions go no farther than to authorize the court to look behind the certificate or exemplification to the record itself. It is true they do not go the length contended for in this case, but there is sufficient to show that the court considered it in its power to prevent any encroachment upon the constitution by the legislative branch of the government, and that such encroachments were the proper subject of judicial investigation. * * In the case of The People *v.* Clark, this court held that evidence could be introduced to show the time when a bill received the approval of the executive. In that case the relator claimed an office by virtue of an appointment made under a law passed on a particular day; the defendant claimed the office by an election on the same day; and the court held that if the act was approved after the determination of the election of the defendant, then it did not authorize the appointment, as the relator had already acquired the office by the election, and testimony was admitted to ascertain that fact. A distinction is taken between testimony admitted to explain or ascertain some fact, and testimony introduced to impeach the act itself. If testimony can be introduced to show the exact point of time when an act was approved, which fact, when ascertained, will render the act void, testimony showing that the law was not approved must be equally admissible, as the effect accomplished is the same. * * I hold the authority to inquire beyond the record of a legislative act, for the purpose of ascertaining whether the same has a constitutional existence, to be incident to all courts of general jurisdiction, and necessary for the protection of public rights and liberties. * * Courts are bound to know the law, both statute and common. It is their province to determine whether a statute be law or not. *Nul tiel record* cannot be pleaded, but it must be tried by the judges, who must inform themselves in any way they can: from history, general observation, the examination of parties, or such

other means as are at their command.   It is true that the record of the legislative act might, in the first instance, be *prima facie* evidence of its correctness, and the court might, in doubtful cases, give the benefit of the doubt in favor of the record ; but when the court was satisfied that a law had never passed according to constitutional provisions, and that it was no law in fact, what apology or excuse would be offered for enforcing its provisions? If the courts are to be stopped by the record from this inquiry, they might, as in the present instance, be compelled to administer as law that which never was law, merely because it purported to be a legislative record, when inquiry would show that it wanted one of the essential requisites of a record, viz: that it was not signed by the proper officers, within the constitutional time for its approval, and was therefore wholly worthless and void.   It is said that parties would, in every case, dispute the existence of the law, and that such practice would lead to confusion and perjury. I have already said that this is a question for the court, and why should not the citizen, whose life, property or liberty is made forfeit by the operation of a particular law, be allowed to show to the court, if it is not advised of the fact, that the same was passed in violation of his constitutional rights, or that it has been placed among the archives of government by fraud or mistake, and never had a legal existence?   Is there no way of ascertaining whether the approval of the executive was forged, or whether officers have acted contrary to their constitutional obligations ? It is no sufficient answer that we must rely on the integrity of the executive or other officers, and that the record of acts is conclusive evidence of the truth of such acts.   Our notions of free institutions revolt at the idea of placing so much power in the hands of one man, with no guard upon it but his integrity, and our constitution has wisely so distributed the powers of government as to make one a check upon the other, thereby preventing one branch from strengthening itself, both at the expense of the coördinate branches and of the public.   Such evidence should be of the most satisfactory character, and there is less to be ap-

prehended from the subornation of witnesses, subject to the tests which the law imposes, than from' the exercise of so great a power without restraint or accountability."

Turning now to the adjudications of our own courts, three are found which have a direct bearing upon the question under consideration. The spirit and scope of the opinion in Brady *v.* West, MSS., are cited as an indication of a disposition to permit inquiries into the validity of statutes, though the question in that case was to the right of the court to look into the legislative journals to test the correctness of a published statute. The court, in Swann *v.* Buck 40 Miss., 268, simply followed what was understood to be the ruling in Green *v.* Weller, 32 Miss., 650. In that case, the legislature had submitted to the people a proposed amendment to the constitution; an election was held; the amendment was adopted and incorporated in the organic law. The case assailed the validity of the act of submission on the ground that it failed to receive in the legislature the requisite number of votes, and hence, that the act and the amendment were void. One of the judges was of the opinion that the act, when filed in the office of the secretary of state, became a record which could not be assailed, and upon that ground, sustained both the act and the amendment. Another judge was of opinion that the record of the act of submission in the office of secretary of state was only *prima facie* evidence of its constitutional enactment, and might be assailed by matter *dehors* the record; that is, by reference to the legislative journals, or, as is understood, in a case of necessity, by parol testimony. This judge reached the conclusion that the act and amendment were void. The third judge concurred in the opinion of the latter as to the assailment of a statute, but held that the adoption of the amendment by the people cured any defect as to the act of submission.

To ascertain the attitude of the several members of the court in the last case cited, reference is had to a note by the reporter in Appendix to vol. 33, Miss. The court, in the later case of Swann *v.* Buck, according to the reports or reporter, mistook the views of

the judges in Green *v.* Weller.   And the profession, perhaps, en-
tertain erroneous impressions of the conclusions in that case.   So
far as they bear upon the case at bar, they may be restated :   1.
One judge held that acts, when duly certified, approved and filed
in the office of the secretary of state, became records importing
absolute verity, and unimpeachable for any cause, or in any mode.
2. Two judges held :   1. That statutes certified as above were
*prima facie* valid only, and might be impeached ;  2. That legisla-
tive journals are not records, but memorials of legislative proceed-
ings ; and 3.  That under the constitution and laws of Mississippi,
the record of acts in the office of the secretary of state is only
*prima facie* evidence of their validity and accuracy.

In this connection, and in view of the distinction in England
between the journals of parliament and the " record " of laws, or
parliament roll ; of the statutes of New York, making the certifi-
cate of the secretary of state conclusive evidence of the validity
of acts of the legislature, and of the constitutional and statutory
provisions of other states, giving to legislative journals the char-
acter of a record, the constitution and legislation of Mississippi are
deemed material, as showing that, in this state, the journals of the
legislature and the certificates of the various officials to statutes,
are only *prima facie* evidence of the facts which they contain.

Upon this point, reference is made to the constitution and laws
without discussion.   Const., art. IV, secs. 14, 24 ; Code, ch. 3,
art. 3 ; id., ch. 4, art. 2 ; id., ch. 15, § 1520, and the adjudications
of our own courts, *supra.*

And now, by way of emphasizing the point under discussion,
several intimations heretofore made may be repeated in more pos-
itive terms :

1. This is not a case involving an inquiry into the "motives"
of members of the legislature in the passage of bills.   With ref-
erence to the motives of members, the cases adjudicated involved
a limited number of unspecified members.   Suppose the plead-
ings to involve a majority, by name, charging them with casting
their votes, for the act sought to be impeached, corruptly, for a

pecuniary consideration, Would not this constitute, if possible to conceive of it, an "extraordinary" case, of which the courts might and ought to take cognizance?

2. Nor is this a case wherein it is sought to annul an act not passed in accordance with the forms and modes of legislation prescribed in the constitution, such as the several readings of a bill and the like. These are matters of form, and whether they can be so grossly disregarded as to render an act invalid, it is not necessary now to express an opinion. The inquiry is not involved in the case at bar.

But further, in the trial and determination of a question of this character, there are certain familiar rules which should govern the courts, and without the incorporation of which herein, my position would be incomplete:

1. The courts should proceed with great care and caution, and a judgment of annulments should be pronounced only upon clear and conclusive proof.

2. Parol testimony should be resorted to for the impeachment of a statute, or the certificate of its passage only in "extraordinary" circumstances, or in cases of "emergency" or "necessity," as intimated by the learned judges whose words have been quoted.

Is this such a case? I think it is. It seems to be conceded, that the act in question never reached its final passage in the house of representatives.

Suppose it to be openly confessed that the legislative journal and the certificate of the final passage of the act in question are untrue, and that the act published in the statutes never became a law, ought the courts to enforce a statute, as a law, which is no law? Has such an act any binding force? Law is a rule of action, commanding what is right and prohibiting what is wrong. "It is called a rule," says the great English commentator, "to distinguish it from advice or counsel, which we are at liberty to follow, or not, as we see proper, and to judge upon the reasonableness or unreasonableness of the thing advised; whereas, our obe-

dience to the laws depends not upon our approbation, but upon the maker's will; counsel is only matter of persuasion; law is matter of injunction; counsel acts only on the willing, but law upon the unwilling also." But if the lawmaker has expressed no " will," there is no command. The presence of a majority of each branch of the legislature is necessary to the passage of a law, and to become a law, an act must have " passed both houses." Const. art. IV, §§ 12, 24. If it has not so " passed," it is not a law.

" Statute law is the express written will of the legislature, rendered authoritative by certain prescribed forms and solemnities." 1 Kent, 446. If the legislature has expressed no " will," there is no law, nor statute. What then ? We have seen that the courts of Arkansas annulled an act on the statements of the speaker and clerk that it had never " passed," and that it had been certified by mistake. Why shall not the courts of Mississippi examine the speaker, clerk and members of the house upon the issue in the case at bar ? There is no law nor reason to the contrary, but a " great end of justice " to be obtained " not otherwise to be reached." Is there not " some great end of justice" involved in this inquiry ? The courts must entertain and investigate the issue, or occupy the worse than absurd position of enforcing an act which never passed into a law. The delicacy in such a case is far less than to declare a statute, regularly passed, to be unconstitutional, because in conflict with the fundamental law. Assuredly, the case is " extraordinary," the " necessity " is apparent, and the jurisdiction is, as clearly within the power and duty of the judiciary as any which can be presented. I can see no distinction and no reason, why the courts should not exert their authority in this, as in all cases involving the validity of statutes for any cause.

As this is the first instance in this state, if not in the whole country, of a case of this chararter, with the firm action of the courts, it will doubtless be the last.

The vast amount of business transacted, the hurry and confusion in the midst of which much of it is conducted, and the great

number of persons employed on these journals, afford the clearest grounds why they should not be invested with unimpeachable verity. But more than this, the records of this court, and the journals of the legislature of this state, for the last few years, contain proof of the most reckless and corrupt tampering with bills if not with the journals. Those at all familiar with the subject are well aware of the painful truth of the words of the pure and able jurist, who said, "The hurry and looseness with which the journals are copied necessarily impair confidence in their correctness. They are most uncertain data upon which to found a judicial determination of the rights of property, much more of great constitutional questions."

If, as in California, it may be shown by parol testimony that the approval of a bill by the governor is on a day other than that certified by him, assuredly it may be shown by similar testimony, that the certificate of the presiding officer of one of the legislative bodies, of the passage of a bill, was at another date than that certified by him, or that his certificate is altogether false and that the bill never, in fact, " passed."

The return of a sheriff may be shown to be false. Code, § 226. Why not the certificate of the presiding officer of one of the two houses of the legislature ?

Suppose the signature of the governor to be forged to the approval of a bill, or the signature of the presiding officers of the respective legislative bodies, or of the secretary or clerk of those bodies, to a false entry in the journals. The propriety of showing the forgery, and thus impeaching a pretended statute, can scarcely be questioned.

The judge of a court of record cannot be attacked collaterally, because the record of such a court imports absolute verity. Yet, its judgments may be impeached for fraud. Placing legislative journals upon the footing of absolute verity, and still they may be assailed as fraudulent, which is all that is claimed in the case at bar. But it has already been conclusively shown, that legislative journals do not possess the character of veritable records, and thus the conclusion is inevitable.

A firm, prompt stand by the judiciary on the question under discussion would, in my opinion, have a most salutary effect in checking evils of a most wicked and dangerous character.

The sole argument, if it can be so classed, observed in all the authorities, aside from precedent, opposed to the exercise of the jurisdiction invoked, is, that it would unsettle the laws. In what way or particular this result would follow is not specified, and thus the apprenension is undefined, vague and shadowy. The fear, in my judgment, is groundless. From my standpoint this is the old, time-honored appeal against progress, new rules, new legislation and new jurisdictions. I will merely add, that the only substantial argument offered, pending the case at bar, against the jurisdiction asked to be exerted, is this, that the annulment of a statute in one case, resting upon facts in parol, might not be accepted as binding in another. Admitting the full force of this argument, it can only be replied, that there should be some escape from the odious and humiliating position of enforcing as law that which is not law; that respect is always paid to the decisions of the courts; and that, if the proof is clear, positive and conclusive (and the courts should proceed in no other), there, is little doubt that a decision adverse to a pretended statute would be respected. At any rate, no such act could ever be enforced.

In concluding the consideration of the first question presented in this case, the argument thus far may be advantageously exhibited in brief:

1. A legislative journal is not a "record" which imports absolute verity. It is not such a record unless made so by constitutional or statutory regulation. "Journals are no records, but remembrances for forms of proceedings to the record." They are "mere memorials, evidence for some purposes, perhaps, but not for all."

2. The forms, ceremonials, routine and solemn observances through which, in Great Britian, an act of parliament winds its way to an enrolment in chancery, where it becomes a "high

record," importing absolute verity, afford neither illustration nor precedent for our simple method of certifying, approving and filing acts with the secretary of state.

3. The question involved is as clearly one for the courts as any other affecting the rights, property or liberties of the people. It is as much so as the constitutionality of the statutes, which the courts constantly entertain. It has been substantially adjudicated by the courts of several states, as in New York, Arkansas and California. The only difference between the case at bar and the one in Arkansas is this, that the latter was placed upon the footing of a mistake, as this may prove to be on investigation. The courts of this country are the expounders of our constitutions and laws, and they have always before them questions reaching " as well to the legislative as to the other branches of the government."

4. "Judges are bound to take notice of a general law, and it is their province to determine whether it be a statute or not ; for as against a general statute, *nul tiel record* cannot be pleaded, but it must be tried by the judges who are to inform themselves in the best way they can, and if there be any difficulty or uncertainty, they are to make use of ancient copies, transcripts, book, pleadings or any other memorial for that purpose." Chancellor Walworth ; Dwarris, *supra*. If these may be referred to, why may not the judges examine the presiding officers and members of the legislature ? C. J. Nelson was of the opinion, that parol evidence, in a proceeding like this, might be resorted to in case of " absolute necessity." Bradish, president of the senate of New York, and a lawyer of some eminence, expressed the opinion, that the question might arise in a mode compelling its adjudication. Verplanck, senator, and a lawyer of distinction, concurred with Bradish, and said, " There may occur some special cases when a plea, formed to put in issue the validity of a statute, * * might be sustained by a court anxious to obtain some great end of justice, not otherwise to be reached." Is this not such a case ? Cowen, one of the most learned and distinguished

of the New York judges, distinctly recognized the power of the courts, on a plea for that purpose, to inquire into the validity of a statute.    Paige and Willard, among the purest and most enlightened of jurists, gave utterance to like views.    The latter said : " An issue ought to be made up by the parties for that purpose."   The cases cited from California and Arkansas, and the views of Smith, C. J., in Green v. Weller, are worthy of special attention.

5. The objection that the exercise of the jurisdiction contended for would tend to unsettle the laws is without merit.    This argument is vague, indefinite, and can influence the timid only.    It can unsettle such laws only as deserve to be unsettled.    This inquiry, according to the authorities, is made by the courts without a jury.    It is not an investigation into the motives of members, nor as to the forms and modes of legislation ; but the question is, whether or not an act pending in the legislature ever reached a final vote.    If not, it is no law, and ought to be so declared, whether certified to the governor by mistake as in Arkansas, or fraudulently approved as in California.    The investigation should be conducted with great caution and prudence ; and judgment adverse to a published law should be declared only upon the clearest evidence.    Governed by these rules, the subject can be safely entrusted to the courts.    It seems to be generally assumed that the act in question never " passed " into a law.    An investigation, with the precautions suggested, could not result otherwise than in good, whichever way determined.    No moral enterprise can thrive through injustice, such as is involved in the enforcement of an act never " passed."    It is no reply, that intemperance is an evil.    One public wrong is apt to be followed by another, and the injustice of enforcing as law the forms of a statute never enacted might offer an excuse for applying a like chalice in return.

Finally.    Although my views do not now prevail, I have no less confidence in their correctness, and believe their expression will lead to legislation or a constitutional amendment providing

for an issue, trial and adjudication in cases presenting the precise question, the discussion of which is herewith closed in the courts for the present.

## PART II.

I proceed now to the consideration of the constitutionality of the provision of the act in question requiring the action of the mass of females in its administration. In support of this measure> the broad proposition is submitted by counsel that "it is settled in this state that the legislature may enact a law and make its operation dependent on a future event, as a vote of the people; and that event may be anything the legislature may please to designate." And he cites Alcorn v. Hamer, 38 Miss., 652; Cooley's Con. Lim., 117; State v. Parker, 26 Vt., 356; Smith v. Janesville, 26, Wis., 291.

It is, however, now sought to sustain the legislation in question by ignoring the doctrine referred to by counsel upon the theory that the terms of the act are mere "restrictions" thrown around the issuance of licenses, and that the doctrine of the delegation of legislative power is not involved in the decision of this case.

The discussion which follows embraces several points subordinate to the leading proposition, such as the delegation of 'legislative power, and legislation dependent upon a future event; the limit of legislative discretion in the enactment of conditional statutes; the mode of ascertaining the will of the people, as by election or petition; the right of females to participate in governmental affairs, etc.; though no pains will be taken to preserve any order in their development. If demonstration is necessary to show that a statute empowering local authorities to grant or refuse licenses is a delegation of legislative power, and legislation dependent upon a contingency, reference need be made simply to the adjudications and text books cited herein. Most assuredly text writers and jurists will be surprised to learn that the power conferred upon municipal authorities to grant or refuse licenses upon certain conditions does not belong to the subject upon which they have devoted so much learning, time, and labor.

In this connection, a classification or statement of the different phases in which the subject of the delegation of legislative power has been presented and discussed would be profitable. But as this is not vital, it will be pretermitted because of the undue length to which it would swell this opinion. It should be stated, however, that in some instances these questions arise out of school laws submitted to school districts, townships, counties, or to the entire state (15 Barb., 112); the taxation of shares in national banks, contingent upon a vote of the state (26 Wis., 291); the creation of a board of public works, dependent upon the will of the voters of the corporation (24 Wis., 149); granting or refusing licenses for the sale of vinous and spirituous liquors, determined by a vote of the state, county, town, city or district (25 Md., 558; 6 Barr., 507; 8 id., 395; 5 Iowa, 491; 10 Foster, 279; 4 Harrington, 479); and so on almost without limit. In each and all of these the doctrine of the delegation of legislative power is fully discussed. In all it is agreed that legislative power cannot be delegated; yet, it is also agreed that the operation of a law may be made conditional, or to depend upon a future event or contingency; in which case the statute may become a dead letter, a "lifeless corpse," or the contingency may serve "to infuse vitality into the lifeless form of the statute." Such is our license law. It is lifeless until vitality is infused into it by the will of those upon whose consent it is contingent.

The distinction drawn by the adjudications between statutes depending upon the will of the people for adoption or rejection, and those made contingent upon the same will, is in some instances difficult of statement, reaching, as it does, to a refinement so nicely balanced as almost to defy classification in ordinary language. Indeed, for this distinction, quite proper to be understood in this discussion, reference is made to the cases (8 N. Y.; 15 Barb.; 26 Vt.; 24 Wis.; 26 id.) cited herein, and the cases therein referred to.

The rule as to the delegation of legislative power is this:

" One of the settled maxims in constitutional law is that the

power conferred upon the legislature to make laws cannot be delegated by that department to any other body or authority. Where the sovereign power of the state has located the authority, there it must remain; and by the constitutional agency alone the laws must be made until the constitution itself is changed. The power to whose judgment, wisdom and patriotism this high prerogative has been entrusted cannot relieve itself of the responsibility by choosing other agencies upon which the power shall be devolved, nor can it substitute the judgment, wisdom and patriotism of any other body for those to whom alone the people have seen fit to confide this sovereign trust. Cooley on Const. Lim., 117.

Locke on Civil Government, § 142, says: "These are the bounds which the trust that is put in them by society and the laws of God and nature have set to the legislative power of every commonwealth, in all forms of government:

"*First.* They are to govern by promulgated, established laws, not to be varied in particular cases, but to have one rule for rich and poor, for the favorite at court and the countryman at plough.

"*Secondly.* These laws also ought to be designed for no other end ultimately but the good of the people.

"*Thirdly.* They must not raise taxes on the property of the people without the consent of the people, given by themselves or their deputies. And this properly concerns only such governments where the legislation always in being, or at least where the people have not reserved any part of the legislation to deputies to be from time to time chosen by themselves.

"*Fourthly.* The legislature neither must nor can transfer the power of making laws to anybody else, or place it anywhere but where the people have."

The reasoning in our form of goverment is, that, by the constitution, the legislature is the only body of men clothed with the power of legislation. The people voluntarily surrendered the power of legislation when they adopted the constitution. The government is democratic, but it is a representative democracy,

and in passing general laws, the people act only through their representatives in the legislature. Cooley, 120.

That legislative power cannot be delegated, see the numerous cases cited in note 1, Cooley, 117; 15 Barb., 112; id., 122; 8 N. Y., 483; 23 Barb., 349; 4 Han., 479; 2 Iowa, 165; 5 id., 491; 9 id., 203; 33 id.,134; 3 Mich., 343; 1 Ohio (N. S.), 77; 6 Penn. St., 507; 11 id., 61; 4 Ind., 342; 11 id., 482; 26 Vt., 362; 17 Tex., 441; 3 R. I., 33; 45 Mo., 458.

The legislature can no more delegate its proper function than can the judiciary. 5 Watts and Serg., 283. "Municipal law is a rule of civil conduct prescribed by the supreme power of a state;" and "statute law is the express written will of the legislature, rendered authentic by certain prescribed forms and solemnities." 1 Kent's Com., 446. Law is a rule of conduct prescribed by legislative power for the government of the citizens of a state; legislative power is vested in a legislature consisting of a senate and house of representatives. The people divested themselves of all legislative power, and vested it in this body. They can resume it only in the forms of the constitution, or by revolution. The legislature cannot delegate this power to any other person or body; not even to the people at large, nor can they make it depend on the assent or approval of any other. Rice v. Foster, 4 Harring., 479. Such is the doctrine or general rule as to the delegation of legislative power, and were this subject now for the first time before the courts, it would seem that there could be no doubt as to its settlement adverse to the practice which has obtained, however, in the face of the rule so plainly stated, and as correctly founded as it is upon principle.

There has grown up as a feature of our institutions, the practice of obtaining the sense of the people upon various debatable laws, general as well as local, such as school laws, license laws, the formation of new counties, the location of county sites, subscriptions to railroads, etc. Large discretionary powers are conferred upon county, town and city authorities to legislate for local purposes. These laws have been as various as the states and the

subjects of legislation, and, necessarily, have given rise to a vast concourse of litigated cases and questions innumerable in which this matter of the delegation of legislative power and conditional legislation, or legislation dependent upon some future event or contingency, has been considered in every conceivable aspect. In all this multitude of conditional or contingent laws, when referred to the will or wishes of others, their approval, acceptance, or rejection has been submitted to the legal voters or taxpayers interested, and their opinion has been variously ascertained, sometimes by a formal election, at others by petition.

As an historical fact it may be stated that from the earliest settlements of this country, north and south, the people — the legal voters — or tax payers only, have been consulted in some form as to their opinion or wishes, with reference to certain laws, general and local. For the first time in this history, the law under consideration appeals for its vitality to the agency of the entire population of females of the age of 18 years and upwards. History will furnish no instance, in this country, where the mass of females have been invested with any legislative power, either by vote or petition, to accept or reject any provision of law. Hitherto, the people, the males, the legal voters, as the source of sovereign power and of government, have alone been called upon for their opinion of particular measures. And, it is immaterial by what means the operation of a law is determined, whether by a formal election or by petition. In either case, it is the opinion of those upon whose action, by ballot or petition, the law is made to depend. So, it is immaterial whether prohibition is the rule and license the exception, or license the rule and prohibition the exception, as, in either case, the result is determined by election or petition, by those upon whose will, however expressed, the law is made to depend. In either case, the law is made contingent upon a future event. That event, in the case at bar, is the petition of a majority of legal voters, and of females over 18 years of age. To call this merely a "restriction" upon the license system, is to avoid the real issue for which the modern system of teaching languages in "easy lessons" is the only precedent.

It has been intimated that, notwithstanding the general rule that legislative power cannot be delegated, there has grown up a practice creating many exceptions. Some of these exceptions, and the discussions to which they have given rise, may serve to develop and illustrate this subject:

1. A statute may be conditional, and its taking effect may be made to depend upon some subsequent event. Cooley, 117; Brig Aurora v. United States, 7 Cranch, 382; Bull v. Read, 13 Grat., 78; State v. Parker, 26 Vt., 357; Peck v. Weddell, 17 Ohio (N. S.), 271; State v. Kirkley, 29 Md., 85; 24 Wis., 149; 26 id., 291. The statute in 7 Cranch was dependent upon the proclamation of the president, to be based on the condition of our foreign relations. In the other cases, the statutes depended upon a vote of the people.

2. A private act of incorporation cannot be forced upon the corporators; the parties interested may accept or reject the charter at their option. Cooley, 117: Angell & Ames, § 81.

3. Acts incorporating towns, villages and cities are, often and may be, legally referred to the people (legal voters) interested, for acceptance or rejection. Cooley, 118, and cases cited by him.

4. The adoption or rejection of a police regulation is often referred to the voters of the particular locality. Cooley, 123.

5. The question of a levee tax may lawfully be referred to the voters of the district or territory over which it is proposed to spread the tax, regardless of municipal divisions. Alcorn v. Hamer, 38 Miss., 652, which, by the way, is the ablest exposition of the subject discussed, whether by counsel or court, that has fallen under my observation in the course of this examination.

6. A statute in which the legislative will is unexpressed, but its adoption or rejection is submitted to the people, is held unconstitutional. 8 N. Y., 489. But a statute, complete in all its parts, whose operation or suspension is made contingent upon the will of the people, is valid. 8 N. Y., 489; 24 Wis., 149; 26 id., 291. See the cases for the distinction, which is questioned by able jurists. The distinction is certainly nice, if not refined.

7. In no instance have the mass of females been consulted as to the operation of laws. And to this rule, the consent of heads of families, including females, when heads of families, to the sale of school lands, in this state, constitutes a strictly isolated exception, and not a precedent, nor an approach to a precedent, for the act in question.

With reference to the mode of obtaining the will of the people upon a particular measure, whether by an election or petition, is wholly immaterial. In Starin v. Genoa, 23 N. Y., 441, power was conferred upon the authorities of that town to borrow money on the credit of the town, contingent upon the assent of two-thirds of the tax payers, to be ascertained by petition and not by a formal election. Counsel and court discuss the case on the assumption, as of course, that the mode of ascertaining the will of the people, whether by petition or an election, is matter of indifference, and that the real question involved was as to the delegation of legislative power. Gould v. The Town of Sterling, 23 N. Y. Court of Appeals, 445, involved the power of the legislature to authorize the town officers to subscribe for railroad stock, with the assent of two-thirds of the tax payers, to be ascertained by petition. And like views were expressed as in Starin v. Town of Genoa.

Our license law is prohibitory, except by the petition of those whose consent the law requires. So, in the cases just cited, the power to borrow money or to subscribe for railway shares was prohibited, except upon the petition of the requisite number of tax payers. The bare suggestion of the assent of the females of those towns as a prerequisite to the validtiy of the powers conferred, is sufficient to call forth the instant expression that such a condition would have been promptly and almost without discussion, declared unconstitutional. It would have been scouted and treated as a nullity.

It is said by Cooley, referring to the opinion of RUGGLES, C. J., in Barto v. Himrod, 8 N. Y., 489, that "the representation in these cases has fulfilled precisely those functions which the people as a democracy could not fulfill; and where the case has

reached a stage where the body of the people can act without con-
fusion, the representative has stepped aside to allow their opinion
to be expressed.   The legislature is not attempting in such a case
to delegate its authority to a new agency, but the trustee, vested
with a large discretionary authority, is taking the opinion of the
principal upon the necessity, policy, or propriety of an act which
is to govern the principal himself." Cooley Con. Lim., 120-1, note.

REDFIELD, C. J., in State *v.* Parker, 26 Vt., 357, says:   "If
the operation of a law may fairly be made to depend upon a future
contingency, then, in my apprehension, it makes no essential dif-
ference what is the nature of the contingency, so it be an equal
and fair one, a moral and legal one, not opposed to sound policy,
and so far connected with the object and purpose of the statute as
not to be a mere idle and arbitrary one.   And to us the contin-
gency upon which the present statute was to be suspended until
another legislature should meet and have opportunity of recon-
sidering it was not only proper and legal, and just and moral, but
highly commendable and creditable to the legislature who passed
the statute; for at the very threshhold of inquiry into the expe-
diency of such a law lies the other and more important inquiry,
Are the people prepared for such a law?"

In New Hampshire, an act was passed declaring bowling alleys,
situate within twenty-five rods of a dwelling house, nuisances;
but the statute was to be in force only in those towns in which it
should be adopted in town meeting.   In State *v.* Noyes, 10 Fost.,
293, it is said: "If the legislature may pass a law authorizing
towns to make ordinances to punish the keeping of billiard rooms,
bowling alleys, and other places of gambling, they may surely
pass laws to punish the same acts, subject to be adopted by the
town before they can be of force in it."   Here were nuisances in
the shape of gambling houses within a few rods of private dwell-
ings.   Surely, females were interested in their abatement, as much
so as in the promotion of temperance in Mississippi, yet a refer-
ence of the law to the females of those towns would most unques-
tionably have been held unconstitutional.

In the language heretofore quoted, the legislature of Mississippi in submitting the granting or refusing a license to females, was attempting in such a case to delegate its authority to a " new agency." The trustee, the representative, was not merely submitting .the necessity, policy, and propriety of a license to the principal, the sovereign, the source of power, the legal voters, the people, but to a new agency, unknown to the constitution and laws for such a purpose.

The right of absolute prohibition is incontestably settled by all the best authorities, as is, also, the power of the legislature to confer upon local authorities discretion in granting or refusing licenses. But the broad proposition that the operation of a law may be made to depend upon "anything the legislature may please to designate " is utterly untenable." If sustained and carried out in practice, as is not improbable in our condition of society, the most absurd, if not unjust results might follow, for, if the granting or refusing a license may be dependent upon "anything the legislature may please to designate," then, this discretion may . be made contingent upon the will alone of the females of a particular locality or color; or females of a particular church or congregation; or upon any unfair, unequal, unjust condition which can be suggested.

But there is another and, as conceived, conclusive view of the point under consideration, not only that the discretion of the legislature does not extend to " anything" it may please to designate, but that the law is unconstitutional. The statute includes females over 18 years of age, but males over 21. This is unequal, unfair, unjust, and obnoxious to the whole theory, as well to the letter as the spirit of our institutions. Our government is one of written constitutions, and not an absolute monarchy. There is no reason why males between 18 and 21 have not the same interest in society and government, and the same capacity and judgment, as females of that age. The discrimination cannot be defended, and is, in fact, a violation of reason, justice, and of the most sacred principles of our form of government.

For this inequality in the law, if on no other ground, the statute involved is unconstitutional.   See opinion of REDFIELD, C. J., 26 Vt.

If it is conceded, as it must be, that there is a limitation to the delegation of legislative power, or to the "restrictions" which the legislature may impose upon the granting of licenses for the sale of vinous and spirituous liquors, as to the will of the people, what is the limit of the discretion in this direction?   In addition to what has already been said to show that the will of legal voters and heads of families, including females when the head of a family, can only be consulted, I deduce what I conceive to be a conclusive argument from the history of our institutions: "In the examination of American constitutional law, we shall not fail to notice the care taken and the means adopted to bring the agencies by which power is to be exercised, as near as possible to the subjects upon which the power is to operate." Cooley Const. Lim., 189. "The primary and vital idea of the American system of government is, that local affairs shall be managed by local authorities, and general affairs by the central authority." Id. It was under the control of this idea, "that a national constitution was formed, under which the states, while yielding to the national government complete and exclusive jurisdiction over external affairs, conferred upon it such powers only in regard to matters of internal regulation, as seemed to be essential to national union, strength and harmony. It is this, also, that impels the several states, as if by common arrangement, to subdivide their territory into counties, towns, road and school districts, and to confer upon each the power of local legislation." Id. "The system is one which almost seems a part of the very nature of the race to which we belong. A similar subdivision of the realm, for the purposes of municipal government, has existed in England from the earliest ages; and in America, the first settlers, as if instinctively, adopted it in their frame of government, and no other has ever supplanted it or even found advocates. In most of the colonies the central power created and provided for the organization

of the towns; in one, at least, the towns preceded and created the central authority; but in all, the final result was substantially the same, that towns, villages, boroughs, cities and counties exercised the powers of local government, and the colony or state the powers of a more general nature." Id. It is remarked by the historian Arnold, that when the charter of Rhode Island was suspended, to bring that colony under the dominion of Andros, "the American system of town governments, which necessity had compelled Rhode Island to initiate fifty years before, became the means of preserving the individual liberty of the citizen when that of the state or colony was crushed." BELL, J., in State v. Noyes, 10 Fost., 292, says: "It seems to be generally conceded that powers of local legislation may be granted to cities, towns and other municipal corporations. And it would require strong reasons to satisfy us that it could have been the design of the framers of our constitution to take from the legislature a power which has been exercised in Europe by governments of all classes, from the earliest history, and the exercise of which has probably done more to promote civilization than all other causes combined; which has been constantly exercised in every part of our country from its earliest settlement, and which has raised up among us many of our most valuable institutions." The deduction from this reference to the origin, growth and perfection of our institutions is conclusive. Males only have the right of participation in their political management; and, until authorized by constitutional provision, such right cannot be conferred upon females by the legislature.

It results that the right of entire prohibition is well settled and cannot now be questioned. Confined to voters and heads of families, the law may impose the consent of any portion of these as the condition of a license; but the interposition of the mass of females is a condition obnoxious to the constitution. As expressed by C. J. REDFIELD, in 26 Vt., this contingency is "unequal and unfair;" opposed to "sound policy;" it is "a mere idle and arbitrary" contingency, and illegal. Except in the sale

of school lands in this state, history furnishes no instance of the submission of laws to the will of females, and none whatever making their operation depend upon the mass of that portion of the population. They have never been consulted as a class in the administration of the laws, and cannot participate therein without an amendment of the organic law. They are not recognized as having a voice, except the "still small voice" of moral influence, to which we are all happy to bow, in the active political management of government.

It has been suggested in support of this law, that females are most deeply interested in the subject of temperance. In fact, it is the only point of strength in its favor, but this is only a reference to the policy of the law and an appeal to those sympathies which profoundly impress all men.

Of course, the policy of the statute under consideration is not recognized as the proper subject of judicial consideration, but as it has been appealed to, I may repeat what is understood to be the result of the true temperance sentiment of the state, viz: that as a matter of policy, the statute under consideration has been a most disastrous failure, and not only a failure, but most pernicious and demoralizing. Dram drinking is certainly unchecked, if not increased, and the number of licenses undiminished.

I yield to no man in respect for woman. She inspires the noblest, holiest emotions. If women over 18 years of age are interested in the subject of present discussion, so are females, and males as well, under 18, even to infants of tenderest years. The sufferings of these from intemperance, however, has not been lessened, or checked even, but rather increased, by the law of 1874, yet, under the broad doctrine upon which the present statute is sustained, they might and ought to have a voice in granting or refusing licenses. With reference to the policy of the present statute regulating that subject, it need be said further, only, that the special provision giving the mass of females a voice in the matter is understood to be almost unanimously, perhaps

without exception, considered improvident and pernicious legislation in its practical workings.

[Since writing this opinion, I have seen for the first time the leading article in "The American Law Register" for March, 1873, entitled "The Constitutionality of Local Option Laws." That discussion of the subject begins thus: "What is the nature of legislative power — when is it exercised — and when is it delegated? are the questions which are suggested by this popular phrase." I add this as an authority, or argument, which is esteemed unanswerable and conclusive of the views which I have expressed. The law involved in the case at bar cannot be sustained as a mere restriction upon the license system. This is simply to ignore the real questions presented. They are too important to be thus disposed of.]

Upon principle, I am of the opinion that so much of the statute under consideration as requires the participation of the mass of females over 18 years of age, in applications for license to retail vinous and spirituous liquors, is unconstitutional and void. It is a myth, and county and city authorities should disregard it.

There should be judgment accordingly.